998 A.2d 459

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. GRACIANO MARTINEZ ROSALES,
DEFENDANT–APPELLANT.

Argued February 2, 2010—Decided July 19, 2010.

*Michael B. Jones,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *William P. Welaj,* Designated Counsel, on the letter brief).

*Joie D. Piderit,* Assistant Prosecutor, argued the cause for respondent (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

*Johanna Barba Jones,* Special Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney).

Justice WALLACE, JR., delivered the opinion of the Court.

The issue before us is whether it was error to deny defendant Graciano Martinez Rosales' request to call a psychiatrist as an expert witness to testify that defendant's confession was not voluntary. Defendant was indicted for the death of the victim, based, in part, on his confession. Defendant's motion to suppress

his statement was denied. Prior to trial, defendant moved to present expert psychiatric testimony that, based on defendant's background and the circumstances surrounding the interrogation, he confessed to a crime he did not commit. The trial court denied the motion. A jury subsequently found defendant guilty. On appeal, defendant challenged the failure to permit his expert to testify that his statement was not voluntary. The Appellate Division affirmed. We granted defendant's petition for certification, *State v. Rosales*, 200 *N.J.* 475, 983 *A.*2d 201 (2009), and now affirm. We conclude that, on the record before the court, it was not an abuse of discretion to reject the expert's proposed testimony that defendant confessed to a crime he did not commit.

I.

We summarize the pertinent facts necessary to decide this appeal. The indictment arose out of the stabbing death of Carolyn Arrington in July 2004. On August 5, 2004, the owner of an apartment building, located in Perth Amboy, discovered the dead body of Arrington in the basement and called the police. Lieutenant Phillip Terranova and other officers arrived to find the decomposing body of the victim. There was blood spatter throughout the basement.

Detective Steven Killane was assigned to lead the investigation. On August 7, 2004, Detective Killane returned to the building where the incident occurred and came upon Pedro Ventura. Ventura invited Detective Killane into his apartment. Once inside, the police observed a marijuana pipe in plain view and arrested Ventura. When questioned about the slain woman, Ventura admitted that several days earlier, he and defendant entered the basement to have sex with the victim. He stated that defendant argued with the victim, stabbed her, and placed the bloody knife in the garbage outside the building.

The next day, Detective Killane and three other officers visited defendant at his apartment on State Street in Perth Amboy. Defendant agreed to talk to the police and accompanied the

officers to the police station. After the police read defendant his *Miranda*[1] rights, he signed a card acknowledging his waiver of those rights.[2] During an approximately thirty-minute interview, defendant denied involvement in the murder.

The police then asked defendant if he would agree to submit to a polygraph examination, and defendant said he would. Because the examiner was not available until the afternoon, defendant was given the option of going home or remaining at headquarters. Defendant chose to remain at headquarters.

At approximately 2:00 p.m., the police transported defendant to the Middlesex County Prosecutor's Office, where the examination would take place. Prior to the polygraph examination, Sergeant Irma Alvarez issued defendant a second set of *Miranda* warnings. Defendant waived his rights and signed the *Miranda* card. Alvarez administered the polygraph examination from 5:11 p.m. to 5:43 p.m. Following the examination, Alvarez informed the officers that the test revealed that defendant had not been truthful.

Several hours later, near 9:00 p.m., the police reissued *Miranda* warnings to defendant, and he again waived his rights. In a recorded statement, defendant admitted he had sexual relations with Arrington on multiple occasions, including the night of the incident. However, defendant stated that when he left the basement Arrington was fine. Further, defendant explained that, as he was leaving, he saw a young man walking down the basement steps towards Arrington. He ignored the young man and went to visit Ventura in his apartment. After leaving Ventura's residence, defendant claimed he heard a woman scream and he ran home.

The police moved defendant to the Perth Amboy Police Department to view a photo array of potential suspects in an attempt to identify the man defendant described as having entered the basement when he was leaving. That proved unsuccessful.

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

[2] This and all subsequent *Miranda* warnings were issued in Spanish.

The police continued to question defendant after he was again informed of his *Miranda* rights and again defendant agreed to speak to the police. Beginning at 12:18 a.m., defendant provided a second tape-recorded statement. On this occasion, defendant added that he had argued with Arrington over the amount of money he had to pay for sex, and as a result of that argument, Arrington slapped him. Defendant explained that he lost control and stabbed her with a blade. He subsequently dropped the knife in a trash bag outside the building. Defendant claimed that he did not intend to kill Arrington and that her death was an accident. The police placed defendant under arrest.

A Middlesex County grand jury indicted defendant for first-degree murder, *N.J.S.A.* 2C:11–3(a)(1) and (2), fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5(d), third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(d) and third-degree hindering apprehension or prosecution, *N.J.S.A.* 2C:29–3(b)(4).

In January 2006, defendant was in jail when he allegedly told fellow inmate, Bernard Dickens, that he had "poked" the victim. Dickens claimed that defendant believed the police did not possess much evidence against him, and that he would claim insanity as a defense. Following that conversation, Dickens contacted the Prosecutor's Office and reported defendant's comments.

Defendant filed a motion to suppress his statements. He retained psychiatrist Dr. Robert Latimer, who met with defendant on three occasions at the prison. Dr. Latimer also reviewed most of the discovery materials generated from the investigation. In his September 22, 2005 letter-report, Dr. Latimer opined that defendant "ha[d] been vulnerable to severe anxiety and panic due to the power of the interrogation setting." He concluded that defendant's "will was overcome to the point where he confessed to a crime he did not commit."

At the hearing on the motion to suppress defendant's statements, the State called Investigator Ricardo, who outlined the timing and details of the circumstances surrounding defendant's

several statements. Next, the court heard testimony from Dr.
Latimer. Limited only to the suppression hearing, the State did
not object to Dr. Latimer's testimony as an expert in psychiatry
and forensic psychiatry. Dr. Latimer described his three, one-
hour interviews with defendant, which he acknowledged did not
include any psychological testing. He related defendant's various
statements concerning what occurred during the interrogation by
the police. Dr. Latimer testified that defendant said the police
had told him that he had five minutes to live, that an electric chair
was coming, and that at one point an investigator picked up the
phone, dialed someone, and appeared to make arrangements to
have defendant picked up to be transported to the electric chair.

Dr. Latimer opined that if such conduct occurred, defendant
would have been demoralized and his will would have been over-
come. He found that defendant was suffering from anxiety and
depression as a result of the ordeal, but that defendant did not
suffer from a personality disorder. Dr. Latimer opined that

[defendant's] situation during what seems to me, as a lay person, as a custodial
situation in which he was held, interrogated, frightened and threatened with
immediate death or death at a later time, was of such a nature as to impart in him
a substantial fear that he was in danger and that he had to somehow get out of that
situation. And this anxiety was sufficient for him to overcome his fear of making
an admission. So the anxiety of being under threat of death caused him to lose his
will and he was overcome by this and issued a false confession. That's my clinical
impression.

The State called Dr. Guillermo Parra, a forensic psychologist, to
rebut the testimony of Dr. Latimer. Dr. Parra evaluated defen-
dant and administered a battery of tests. He said that defendant
had no history of any medical, psychological, or a psychiatric
disorder. Dr. Parra recalled that defendant said he felt threat-
ened and scared when the police came to his house and handcuffed
him. After assessing defendant's performance on nine tests from
the Woodcock Johnson Psycho–Educational Battery, Dr. Parra
opined that defendant was not a person "with limited intellectual
abilities," had the "reasoning ability" of a young adult, and the
ability to read and understand written material equivalent to that
of a first-year college student.

Dr. Parra agreed with Dr. Latimer that defendant was suffering from an adjustment disorder. He described this disorder as the "common cold" of psychology that comes and goes throughout life as people cope with difficult situations, such as adjusting to prison life. However, Dr. Parra disagreed with Dr. Latimer's opinion that defendant's will was overborne during the time he confessed.

Defendant testified on his own behalf. He denied that the police read him his rights or that he signed a *Miranda* waiver form. He claimed he was afraid during the questioning by the police and that the police had threatened him with the electric chair if he did not tell the truth. As a result, defendant stated he admitted to killing Arrington, not because it was true, but because he was afraid he would receive the electric chair. On cross examination, defendant acknowledged that the police provided him with food, allowed him to use the bathroom, did not physically abuse him, and questioned him in a normal-sized room. Defendant also acknowledged that his voice was on the tape-recorder.

The trial court denied defendant's motion to suppress his statements. The court found that defendant's testimony lacked credibility and that Dr. Parra's testimony was more persuasive than Dr. Latimer's. The court explained that because Dr. Latimer's opinion was based on defendant's direct statements to him that he had been threatened with death, Dr. Latimer's diagnosis was plausible because he assumed the threats to defendant actually happened. However, the court did not find that the alleged police threats were made. Further, in crediting Dr. Parra's testimony, the court noted that Dr. Parra based his assessment on "certain objective tests and did not in any way find [defendant] to be mentally impaired or having any type of mental defect that would make it impossible for him to ... validly waive his rights." The trial court concluded "that the State has proven beyond a reasonable doubt the defendant knowingly and intelligently and voluntarily waived his rights on more than one occasion, frankly, and that his will was not overborne by police conduct."

Following the denial of his motion to suppress, defendant sought to have Dr. Latimer testify at trial as an expert on false confessions. To support his motion, defendant submitted a March 23, 2006, supplemental letter-report prepared by Dr. Latimer in which the doctor referenced the works of several authorities on false confessions. Dr. Latimer noted that his testimony would "entail a psychological interpretation of defendant's fear-stricken, panicky reaction to direct death threats," and that the issues were beyond the knowledge of the average person. He explained that "during a stressful interrogation, the stress of denial becomes stronger than the stress of admitting[, and a]t that point, the suspect can easily break and issue a false confession." The State opposed the motion, arguing that Dr. Latimer's opinions were based on generalizations and were not tied to a recognized clinical diagnosis of defendant.

The trial court denied defendant's application and incorporated by reference, its findings in the denial of the motion to suppress. Further, the court cited *State v. Free*, 351 *N.J.Super.* 203, 798 *A.2d* 83 (App.Div.2002), for the proposition that psychological testimony on the issue of a so-called false confession was not admissible because there was no reliable body of scientific evidence that had been established regarding such false confessions. Based on the record before it, the trial court concluded that Dr. Latimer failed to proffer "scientifically reliable evidence that would truly assist the trier of fact."

At trial, the State presented numerous witnesses including: Ventura; the investigators involved in obtaining defendant's recorded confessions; the county medical examiner; the jailhouse informant; and several lay witnesses. Also, the State offered into evidence defendant's recorded statements.

In his defense, defendant called his employer as a character witness and testified on his own behalf. Defendant testified that prior to August 8, 2004, he visited Ventura's apartment on two occasions. Additionally, he denied that he ever had sex with the victim. He stated that the police officers intimidated and threat-

ened him with the electric chair if he did not admit that he killed the victim. Defendant asserted that after providing his first police statement, he noticed Ventura in the police station with several officers. Later, the police told him that Ventura had given a truthful account of what occurred. At that point, defendant explained that he felt all alone and agreed to sign the waiver form. Also, he asserted that the information in his recorded statements was provided to him by the police. Finally, he denied that he confessed to Dickens in jail.

During deliberations, the jury requested to hear both defendant's recorded statements and Ventura's testimony. The trial court complied with the jury's requests. On the third day of deliberations, the jury informed the court that it was deadlocked. Defendant immediately requested a mistrial. The trial court denied the application and instructed the jury using the model charge about how to proceed when a jury is initially unable to reach a verdict. The jury subsequently found defendant guilty of the lesser-included offense of aggravated manslaughter on the murder charge, and hindering apprehension or prosecution, but found him not guilty of the two weapons offenses. The trial court sentenced defendant to a twenty-year prison term on the aggravated manslaughter conviction and a concurrent four-year term on the hindering apprehension conviction.

Defendant appealed, raising multiple issues. Pertinent to this appeal, the Appellate Division, in an unpublished opinion, rejected defendant's contention that the trial court erred in precluding the testimony of Dr. Latimer. The panel reviewed two cases previously decided by the Appellate Division that addressed similar issues. First, the panel noted that in *Free, supra,* the proposed expert was barred because the expert relied solely on general precepts when he concluded defendant's confession was both ambiguous and unreliable. In the second case, *State v. King,* 387 *N.J.Super.* 522, 904 *A.*2d 808 (App.Div.2006), the expert conducted an extensive clinical assessment, including diagnostic testing and individualized interviews. In addition, the defendant had been

hospitalized for psychiatric reasons over forty times in the last twenty-three years and had "embellished, exaggerated or fabricated" his criminal history, "confess[ing] to one unsolved crime after another." *King, supra,* 387 *N.J.Super.* at 534, 904 *A.2d* 808. Based on this, the expert diagnosed the defendant with several mental disorders, correlated those findings to the Diagnostic and Statistical Manual on Mental Disorders (DSM–IV–TR), an authoritative treatise, and opined that those disorders caused a condition in which the defendant would make a false confession. *Id.* at 532–33, 904 *A.2d* 808. The *King* panel held the expert testimony was admissible because the expert "possesse[d] sufficient expertise in the field of forensic psychiatry to apply regularly accepted psychiatric principles in assessing [the] defendant's personality disorder," *id.* at 541, 904 *A.2d* 808, that "the analysis of [the] defendant's psychological makeup [wa]s beyond the ken of the average juror," *ibid.* (citations omitted), and that the "testimony pertaining to defendant's narcissistic and antisocial personality disorders, recognized medical conditions in the DSM, ha[d] similar indicia of reliability in the psychiatric community," *id.* at 546, 904 *A.2d* 808.

In the present case, the panel found that Dr. Latimer's proposed expert "testimony is not based upon a scientifically reliable authority, beyond the ken of an average juror, that general anxiety or fear may produce a false confession." Further, the panel noted that: defendant had no longstanding prior diagnosis of a mental disorder; Dr. Latimer was unable to correlate defendant's confessions to any mental illness; and Dr. Latimer merely alluded to some generalized notions of anxiety and fear on the part of a suspect being questioned by police. The panel concluded that Dr. Latimer's proposed testimony was akin to the opinions excluded in *Free, supra,* and dissimilar to the testimony permitted in *King, supra.*

We granted defendant's petition for certification limited to the issue of whether defendant should have been permitted to call his expert witness to testify that his confession was involuntary.

*Rosales, supra,* 200 *N.J.* at 475, 983 *A.*2d 201. We also granted amicus curiae status to the Attorney General.

## II.

Defendant contends that the expert testimony was admissible pursuant to *N.J.R.E.* 702 and the principles of *Crane v. Kentucky,* 476 *U.S.* 683, 106 *S.Ct.* 2142, 90 *L.Ed.*2d 636 (1986). He asserts that *Free, supra,* is factually distinguishable from the present case, and that, consistent with *King, supra,* Dr. Latimer did not intend to characterize the truth or falsity of defendant's statements, but rather he would have explained that certain conduct was consistent with defendant's mental and psychological makeup. Defendant contends that Dr. Latimer's testimony would have provided the jury with information on subjects beyond the ken of the average juror and would have assisted the jury in determining whether his statements to the police were reliable.

In contrast, the State argues that the trial court's ruling was consistent with *Free, supra,* because there is no reliable body of scientific evidence that has been established regarding the topic of false confessions. The State urges that the trial court properly concluded that Dr. Latimer's proposed testimony had the potential to mislead the jury and would not have assisted the jury because it lacked a scientifically reliable basis. The State contends that unlike *King, supra,* in which the expert doctor made a clinical evaluation from the DSM–IV–TR, here, the expert did not perform a clinical evaluation, but merely offered his interviews with defendant, which simply restated defendant's testimony.

Amicus Attorney General agrees with the State that the trial court properly rejected Dr. Latimer's proposed testimony. The Attorney General argues that: the proposed expert testimony did not comport with the New Jersey Rules of Evidence; psychiatric testimony regarding a suspect's personality is not beyond the ken of an average juror; and mere personality traits are not appropriate subjects for expert testimony. Additionally, the Attorney General asserts that *N.J.R.E.* 403 is an integral part of the

N.J.R.E. 702 analysis and that the trial court explicitly found that Dr. Latimer's testimony was more prejudicial than probative and had the potential to confuse the jury. In the alternative, the Attorney General contends that any error was harmless, because defendant's confession merely corroborated Ventura's account of the crime, and if Dr. Latimer had testified, the State would have refuted his testimony by calling Dr. Parra to challenge his testimony.

### III.

### A.

We start with the proposition that the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution, "guarantee[ ] criminal defendants a meaningful opportunity to present a complete defense." *Crane, supra,* 476 *U.S.* at 690, 106 *S.Ct.* at 2146, 90 *L.Ed.*2d at 645 (citations and internal quotation marks omitted); *State v. Garcia,* 195 *N.J.* 192, 201–02, 949 *A.*2d 208 (2008) (same (citations omitted)). As the United States Supreme Court expressed in *Crane, supra,* "an essential component of procedural fairness is an opportunity to be heard." 476 *U.S.* at 690, 106 *S.Ct.* at 2146–47, 90 *L.Ed.*2d at 645 (citations omitted). Moreover, in reversing the trial court's ruling that prohibited the defendant from presenting testimony describing the length and the manner of his interrogation, the *Crane* Court declared that

> the Court has never questioned that evidence surrounding the making of a confession bears on its credibility as well as its voluntariness.... [B]ecause questions of credibility, whether of a witness or of a confession, are for the jury, the requirement that the court make a pretrial voluntariness determination does not undercut the defendant's traditional prerogative to challenge the confession's reliability during the course of the trial.
>
> [*Id.* at 688, 106 *S.Ct.* at 2145, 90 *L.Ed.*2d at 643 (citations, emphasis, and internal quotation marks omitted).]

Consistent with *Crane, supra,* we have declared that "few rights are more fundamental than that of an accused to present witnesses in his own defense." *State v. Sanchez,* 143 *N.J.* 273, 290,

670 *A.*2d 535 (1996) (citations, alterations, and internal quotation marks omitted).

■ That being said, the introduction of such evidence is limited and subject to "the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane, supra,* 476 U.S. at 690, 106 *S.Ct.* at 2146, 90 *L.Ed.*2d at 644; *see also Sanchez, supra,* 143 *N.J.* at 291, 670 *A.*2d 535 ("[N]either our Rules Governing Criminal Practice nor the Constitution gives a defendant the absolute right to elicit testimony from any person he may desire." (citation omitted)). The trial court must balance those competing concerns in the exercise of its discretion as the gatekeeper for the admission or exclusion of evidence.

The sole issue in this case is whether the trial court abused its discretion in excluding defendant's proposed expert witness from testifying at trial. The admissibility of expert testimony is governed by *N.J.R.E.* 702. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
>
> [*N.J.R.E.* 702.]

■ This Court has explained that:

> The *Rule* has three [basic] requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [*State v. Jenewicz,* 193 *N.J.* 440, 454, 940 *A.*2d 269 (2008) (citations omitted).]

We construe those requirements "liberally in light of *Rule* 702's tilt in favor of the admissibility of expert testimony." *Ibid.* (citations omitted). The party offering the expert testimony has the burden of proof to establish its admissibility. *Hisenaj v. Kuehner,* 194 *N.J.* 6, 15, 942 *A.*2d 769 (2008) (citations omitted). We give substantial deference to the trial court's decision as to whether a witness is qualified to present expert testimony. *Jenewicz, supra,* 193 *N.J.* at 455, 940 *A.*2d 269. Thus, the "court's

witness-qualification decision is subject to essentially an abuse-of-discretion standard of review and will only be reversed for manifest error and injustice." *Ibid.* (citation and internal quotation marks omitted).

## B.

We turn now to apply those principles here. Because Dr. Latimer's general credentials as a psychiatrist were not contested in this case, we need not address his qualifications as an expert. We note only that "our ... courts take a [broad] approach when assessing" the qualifications of a proposed expert. *Id.* at 454, 940 *A.*2d 269.

The first inquiry is whether the subject matter is beyond the ken of the average juror. Here, defendant sought to offer Dr. Latimer's testimony as a "psychological interpretation of defendant's fear-stricken, panicky reaction to direct death threats." Dr. Latimer evaluated defendant on three separate occasions at the prison and diagnosed defendant with an adjustment disorder, anxiety and depression. He opined that defendant's background and personal history rendered him "vulnerable to severe anxiety, and panic due to the power of the interrogation setting," and that defendant's lack of understanding, education, and sophistication, as well as the threats by police of the death penalty and the lengthy interrogation, created an environment that caused defendant to confess to a crime he did not commit.

To a large extent, Dr. Latimer relied on defendant's assertions that the police threatened him with death, and defendant's background and personal history, to conclude that those factors contributed to an involuntary confession. He believed that both defendant's personal history, and the mechanisms behind a false confession were beyond the knowledge of an average juror and thus required scientific explanation. However, Dr. Latimer did not state that an adjustment disorder or any other predisposition to a mental illness made defendant's confession involuntary. Even more germane to the inquiry before us, except for general articles

on false confessions, Dr. Latimer did not cite any specific studies on false confessions or specify the scientific mechanisms behind false confessions.

We agree with the State that to the extent Dr. Latimer's opinion relied on a factual basis to conclude that defendant's confession was involuntary, that factual basis was essentially the credibility determination that the jury must make. In short, Dr. Latimer's proposed testimony did not contain more insight than an average juror would possess through his or her common knowledge when provided with the same facts to understand defendant's position that threats of death led him to falsely confess to preserve his own life.

▇▇▇ Even if we were to conclude that Dr. Latimer's proposed testimony would assist the trier of fact to understand that defendants sometimes give false confessions, defendant must nevertheless meet the requirement that the field of inquiry is generally accepted such that an expert's testimony would be sufficiently reliable. Generally, a proponent of expert testimony may establish the scientific reliability of an area of research or expertise in one of three ways: (1) the testimony of knowledgeable experts, (2) authoritative scientific literature that "reveals a consensus of acceptance[,]" or (3) "judicial decisions that [acknowledge] that particular evidence or testimony is generally accepted in the scientific community." *Hisenaj, supra,* 194 *N.J.* at 17, 942 *A.*2d 769 (citations and internal quotation marks omitted).

In Dr. Latimer's letter-report of March 23, 2006, he refers to the following authorities on false confessions:

> Gudjonsson, "The Psychology of Interrogations and Confessions." This work is an exhaustive compilation of the literature, including the works of Kassin in the matter of False Confessions, Voluntary, Coerced–Compliant or Coerced–Internalized.... (See "Criminal Interrogations and Confessions" by Inbau, et al.) ... The seminal works of Richard Ofshe from Berkley, California[.]

Although Dr. Latimer provided some specifics on what is contained in Ofshe's work, he conceded that "they provide no insight into the mechanism whereby [the] result [is] obtain[ed]."

In rejecting the proposed expert testimony of Dr. Latimer, the trial court stated:

> [Dr. Latimer] would be telling the jury that people have given false confessions in the past. Nothing else that he could say to the jury would be in any way scientifically established or accepted by the scientific community.

We agree. Because that testimony was not about a field that is at a "state of the art" to be considered sufficiently reliable, the trial court properly denied Dr. Latimer's proposed testimony.

The trial court also relied on the analysis in *Free, supra,* to reject Dr. Latimer's testimony. In that case, the Appellate Division reviewed the evidence developed at the pretrial hearing, as well as decisions from other jurisdictions, to conclude that the proposed expert testimony of the psychologist offered in his report on false confessions was "inadmissible as not scientifically reliable." *Free, supra,* 351 *N.J.Super.* at 220, 798 *A.*2d 83. Additionally, the panel opined "that the proposed [expert testimony] failed to satisfy the evidentiary requirement that [it must] assist the trier of fact to understand the evidence or to determine a fact in issue." *Ibid.* (citation and internal quotation marks omitted).

As noted above, in *King, supra,* another Appellate Division panel recently addressed a defendant's proffer of expert psychiatric testimony intended to cast doubt on the reliability of his confession. 387 *N.J.Super.* 522, 904 *A.*2d 808. There, the defendant's psychiatric expert clinically evaluated the defendant and diagnosed him "as suffering from a longstanding Axis II narcissistic and antisocial personality disorder" recognized in the DSM–IV–TR. *Id.* at 532, 904 *A.*2d 808. The trial court ruled that the expert could testify "that he diagnosed the defendant with certain psychiatric disorders, the characteristics of those disorders, and that [the] defendant suffered from those disorders[.]" *Id.* at 528, 904 *A.*2d 808 (internal quotation marks omitted). Additionally, the expert could testify that those disorders were "consistent with the defendant's claim of false confession[.]" *Ibid.* On leave to appeal, the panel affirmed, noting the general acceptance in the psychiatric community of the DSM–IV–TR, an authoritative treatise, and

that the expert's testimony was based on relevant provisions of that treatise. *Id.* at 544, 904 *A.*2d 808. The panel explained that

[t]he proffer is that the presence of the disorders renders a person vulnerable to making a false confession and provides an explanation, other than truth, for the statements [by the defendant]. Thus, it was neither illogical nor erroneous for the trial court to permit [the expert] to testify that [the] defendant suffered from a personality disorder that was "consistent with" his claim of making a false confession, though not "causative" of such claim.

[*Ibid.*]

The panel also found persuasive judicial decisions in other jurisdictions that supported the reliability of the proffered testimony. *Id.* at 544–46, 904 *A.*2d 808 (citing, in particular, *United States v. Shay*, 57 *F.*3d 126, 133–34 (1st Cir.1995) ("finding error by the trial court in excluding expert testimony that the defendant suffered from pseudologia fantastica, 'Munchausen's disease,' an extreme form of pathological lying, which is a recognized mental disease in the DSM, and which caused him to make false statements"); *Beagel v. Alaska*, 813 *P.*2d 699, 707–08 (Alaska Ct.App. 1991) (holding expert's diagnosis of defendant's medically-recognized psychiatric condition under the DSM was admissible)).

In the present case, we agree with the Appellate Division's conclusion that the proposed expert opinion of Dr. Latimer was more akin to the expert testimony disallowed in *Free, supra,* and unlike the expert testimony allowed in *King, supra.* Here, defendant had no longstanding prior diagnosis of a mental disorder. Instead, in support of defendant's motion to allow expert testimony on false confessions, Dr. Latimer simply alluded to defendant's generalized notions of anxiety and fear in the interrogation setting, as well as his education and national origin.

Simply stated, we find nothing exceptional about this case to require an expert to opine that defendant gave a false confession. The average juror would understand defendant's argument that because he was threatened with immediate death by electrocution he gave a false confession to save his life.

We recognize that in some other case the evidence presented may satisfy the New Jersey Rules of Evidence to permit expert

testimony regarding a defendant's confession. We are in general accord with the Attorney General's suggestion that New Jersey should follow the following principle:

> [E]xpert witnesses may testify to a witness's or defendant's mental disorder and the hypothetical effect of that disorder. Expert witnesses may not, however, render an opinion on the defendant's veracity or reliability of a confession because whether a confession is reliable is a matter in the jury's exclusive province; it is essential that the testimony actually tell jurors something they would not otherwise know from their usual human experience and that it remain hypothetical or theoretical, and it must stop short of expressing the expert's judgment on the defendant's reliability in the specific instance of the confession submitted for the jury's consideration.
>
> [23 *C.J.S. Criminal Law* § 1444 (2006) (footnotes omitted).[3]]

We have applied that general principle in other contexts. *See State v. Townsend,* 186 *N.J.* 473, 492–93, 897 *A.*2d 316 (2006) (finding expert "qualified to give expert testimony on battered women and battered woman's syndrome"); *State v. J.Q.,* 130 *N.J.* 554, 556, 617 *A.*2d 1196 (1993) (finding admissible expert opinion of Child Sexual Abuse Accommodation Syndrome in child sexual abuse trial "to describe traits found in victims of such abuse to aid jurors in evaluating specific defenses[,]" but noting error to permit expert to include "opinions on commonplace issues, such as credibility assessments derived from conflicting versions of an event and not-yet scientifically established opinions on the ultimate issues that are for jury resolution.").

To be sure, this case does not present the question whether even without a DSM diagnosis, there might be some other scientifically reliable evidence to warrant expert testimony regarding false confessions. In any event, we leave that decision to another day on a different record.

In sum, we conclude that based on the evidence presented the trial court properly exercised its discretion to exclude the proposed expert testimony of Dr. Latimer.

---

[3] Although the Attorney General cited to the 2002 version of the text, the 2002 and 2006 versions are identical for the principle we quote.

## IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.