42 A.3d 179 (2012)
425 N.J. Super. 474
STATE of New Jersey, Plaintiff-Respondent,
v.
Jennifer Lee LOCASCIO, Defendant-Appellant.
Docket No. A-5119-09T1
Superior Court of New Jersey, Appellate Division.
Argued October 31, 2011.
Decided May 4, 2012.
*180 Frank M. Gennaro, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Mr. Gennaro, on the brief).
Dit Mosco, Assistant Prosecutor, argued the cause for respondent (Thomas S. Ferguson, Warren County Prosecutor, attorney; Ms. Mosco, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ, SABATINO, and ASHRAFI.
The opinion of the court was delivered by
SABATINO, J.A.D.
This vehicular homicide case stems from a one-car accident in which defendant's boyfriend, who had been in the car with defendant, was killed after the car veered off the road and crashed into a tree. Both defendant and her boyfriend had been drinking that evening and were evidently impaired. The pivotal factual question at trial was whether, as the State contended, defendant was driving the car at the time of the crash, or whether, as the defense contended, the boyfriend was driving and defendant was the front-seat passenger. The jury adopted the State's theory and found defendant guilty of vehicular manslaughter.
Defendant's appeal principally raises a novel legal issue in our State as to whether a medical examiner, who the State concedes lacks expertise in either biomechanics or accident reconstruction, may present expert opinions at a vehicular homicide trial about the probable identity of the driver of the automobile before it crashed and the movements of the occupants within the vehicle as it decelerated. For the reasons set forth in this opinion, we conclude that testimony by such a medical examiner as to the identity of the driver must be strictly confined to the areas of that examiner's expertise as to the nature and causes of bodily injuries.
*181 Although it was permissible for the medical examiner to testify in certain respects about the physical forces that caused the boyfriend's fatal injuries, it was improper for him to render opinions about the probable movements of the occupants within the car as it decelerated and crashed, including an analysis of how the passenger's body allegedly "cushioned" the driver's body during the accident. Because such improper opinions, admitted over defense counsel's objections, addressed the crucial disputed issue at the trial, we reverse defendant's conviction and remand for a new trial.

I.
The trial proofs relevant to the issues presented on appeal were as follows. Defendant Jennifer Lee Locascio went out drinking on the night of her twenty-fourth birthday in November 2006 with her boyfriend, Ryan Berry. They traveled in a Chevy Cobalt owned by defendant's father. Defendant admitted that she drove the Cobalt with Berry to a bowling alley, then to a supermarket, and finally to a bar. However, she contended that she did not drive the Cobalt after they left the bar and headed home because she felt she was not capable of taking the wheel at that point.
At about 1:15 a.m., the Cobalt went off the road on Route 519 in Hope Township and struck a tree. Neither defendant nor Berry was wearing a seatbelt. According to the data recorded by the car's "black box" device, the Cobalt had been traveling at 93 mph five seconds before the impact and at 48 mph one second before the impact.[1] The airbags deployed, and both occupants were thrown from the vehicle. Berry was thrown some fifteen to twenty-five feet out of the car, onto a pile of rocks. Defendant was found on the ground closer to the car on the passenger side. Berry died as a result of the crash. Defendant survived, although she was hospitalized for three weeks. The accident was not observed by any eyewitnesses.
A State Trooper responding to the accident scene testified that defendant told him she had been the drivera statement that defendant testified she did not remember making. The parties disputed defendant's coherence and level of consciousness when she spoke with the trooper. Defendant's blood alcohol content ("BAC") was measured at 0.193, and Berry's was 0.209, both well over the legal limit. See N.J.S.A. 39:4-50.
Defendant testified that, after giving Berry the car keys when they left the bar, she got in the passenger seat, removed her sneakers, put her pocketbook on the floor, put her feet on the dashboard, and fell asleep. She contended that she did not wake up until after the collision.
Defendant's father and her brother, who were allowed access to the vehicle the day after the accident, testified that they observed her sneakers and her pocketbook on the passenger-side floor of the vehicle. They also observed Berry's necklace on the driver's seat. Defendant's parents retrieved her belongings from the Cobalt about two months later. On that occasion, they noticed that defendant's sneakers had been moved[2] to the driver side floor, although defendant's pocketbook remained on the passenger side floor. Defendant's parents also discovered her cell phone on *182 the passenger side of the Cobalt, tucked between that seat and the console.
Defendant was issued various motor vehicle summonses, including one for driving while under the influence of alcohol, N.J.S.A. 39:4-50. She was thereafter indicted by a grand jury and charged with vehicular manslaughter, N.J.S.A. 2C:11-5.
The critical factual dispute at the six-day trial was whether defendant or Berry had been driving the Cobalt at the time of the crash. In addition to several fact witnesses, the State presented testimony from three expert witnesses: an accident reconstructionist employed by the State Police, the toxicologist who had measured the parties' BAC levels, and the county medical examiner. Defendant testified on her own behalf. She also presented several fact witnesses, as well as testimony from an expert in accident reconstruction and biomechanics.
The State's accident reconstructionist did not specifically analyze who was driving the vehicle. However, the State presented, over defendant's objection, expert testimony from the medical examiner, explaining why he thought that defendant was the driver at the time of impact.
In contrast, defendant's expert concluded that Berry, not defendant, had been driving the vehicle when it crashed. He generally based his conclusion upon a biomechanical analysis of the forces within the car and a reconstruction of the accident sequence. The defense expert also attempted to explain how the person that he identified as the driver of the vehicle was killed, while the supposed passenger sustained less severe injuries. The jury evidently agreed with the medical examiner's conclusion because it found defendant guilty.
The trial court imposed a custodial sentence of three years, with the mandatory minimum three-year period of parole ineligibility. N.J.S.A. 2C:11-5b(1). As part of its analysis, the court took into account not only the fatal nature of the offense but also defendant's lack of a prior criminal record and her status as a young mother of two dependent children. This appeal followed.
Defendant raises the following points for our consideration:
POINT ONE
THE TRIAL COURT ERRED BY PERMITTING THE MEDICAL EXAMINER TO RENDER AN EXPERT OPINION OUTSIDE THE AREA OF HIS EXPERTISE
POINT TWO
THE TRIAL COURT [ERRED] IN EXCLUDING EVIDENCE OFFERED BY DEFENDANT TO IMPEACH THE CREDIBILITY OF [THE] TROOPER [WHO HAD ISSUED THE TRAFFIC SUMMONSES]
POINT THREE
THE PROSECUTOR'S COMMENTS DURING SUMMATION DEPRIVED DEFENDANT OF A FAIR TRIAL
POINT FOUR
THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S MOTION FOR A NEW TRIAL

II.
The key issue before us is whether the expert opinions adduced by the State from the county medical examiner, Dr. Isidore Mihalakis, a pathologist, delved too far into matters requiring additional expertise in the fields of accident reconstruction and biomechanics. We conclude that the medical examiner's testimony concerning the crucial issue of who was driving the vehicle did exceed the proper scope of his expertise. We further conclude that those improper opinions unduly prejudiced defendant *183 and cannot be excused as harmless error.

A.
Dr. Mihalakis first became involved in this matter when he performed an autopsy on Berry's body at the Warren County morgue on the day of the accident. Dr. Mihalakis has served as the county's medical examiner since 1985, having previously been an assistant medical examiner in Maryland and a pathologist in Pennsylvania. He has a medical degree from the George Washington University Medical School, and he has taught at the medical schools at Johns Hopkins University and the University of Maryland. Dr. Mihalakis is certified by the American Board of Pathology in anatomic pathology, clinical pathology, and forensic pathology. According to his testimony, Dr. Mihalakis has been qualified as an expert witness in pathology in the New Jersey courts about 75 to 100 times. Despite these substantial credentials in pathology, Dr. Mihalakis is not, as the State concedes, an expert in accident reconstruction or biomechanics, although he has taken some courses on those subjects.
As part of his autopsy, Dr. Mihalakis not only examined Berry's body but also reviewed photographs of the accident scene. He did not inspect the Cobalt or travel to the site of the accident itself.
Based on the autopsy, Dr. Mihalakis concluded that Berry died from multiple traumatic injuries. He found that Berry had suffered, among other injuries, lacerations of the right side of his skull, bruising of the brain, lacerations of brain tissue, multiple rib fractures, liver and spleen lacerations, a fractured right arm, and a fractured right thigh bone. The injuries also indicated that Berry's head had been hit on the right side. Dr. Mihalakis concluded that Berry's death had resulted from the car's impact with the tree and that his death was unrelated to his alcohol consumption.
Dr. Mihalakis's autopsy report did not expressly analyze whether defendant or Berry had been driving the Cobalt at the moment it crashed, except that the report[3] apparently described Berry as "passenger in [an] automobile involved in [an] impact with a fixed object[.]"
After defendant was arrested, the State obtained an expert report from Detective Kevin Bartels of the State Police. Detective Bartels, who was one of the law enforcement officers who responded to the accident scene, has background and training in principles of accident reconstruction. As related in his trial testimony, Bartels has a bachelor's degree from Rutgers University in the Administration of Justice and a master's degree in Human Resources Training and Development. At the time of trial, Bartels had been employed by the State Police for twelve years and had been a member of its Fatal Accident Investigation Unit for four years. As a police officer, Bartels had attended classes on accident investigation, vehicle dynamics, motor vehicle accidents, and kinematics. Prior to this trial, he had not been qualified as an expert in accident reconstruction.
Detective Bartels testified that while investigating the scene, he observed a pair of white sneakers on the driver side of the *184 vehicle. He also testified that the driver's seat was stuck close to the steering wheel. The seat was the type that moves backwards and forwards manually, as opposed to electronically. Bartels attempted to lift the lever to move the seat backwards, but it would not move. Bartels testified that "the intrusion from the roof was stopping it" from moving backwards. He also testified that he could not recline the driver's seat.[4] Defendant is five feet, three inches tall, while Berry, as measured in the autopsy, was five feet, eleven and-a-half inches tall.
Based on the location of the seat, the sneakers, and the car occupants' bodies, and the fact that defendant suffered less severe injuries than Berry, Bartels concluded that Berry had been ejected through the passenger window or the passenger door. Significantly, in his trial testimony, Bartels did not specifically analyze whether defendant or Berry had been the driver of the vehicle, although his report apparently did refer to Berry as "the right front passenger."
Prior to trial, defendant's attorney served upon the State a report from Lloyd Patton, whom the defense designated as an expert in accident reconstruction. Patton served as a police officer in Pennsylvania, spending fifteen years in the Accident Investigation Division of the Traffic Homicide Department in Bucks County. Patton has completed courses in accident investigation, accident reconstruction, biomechanics, computer-aided reconstruction, and motor vehicle crashes. He has been certified by the Accreditation Commission for Traffic Accident Reconstruction since 1992. At the time of the trial, Patton was the Vice President of the National Association of Traffic Accident Reconstructionists and Investigators. He had previously been qualified as an expert in accident reconstruction and biomechanics in the courts of eight New Jersey counties.
According to Patton, he examined the impounded Cobalt some eighteen months after the fatal accident. By that time, a significant amount of the physical evidence (such as facial makeup that might have been transferred to the air bag during the crash) had been destroyed or altered because the vehicle had been left exposed to the elements. Patton criticized various alleged failures to preserve and examine the car's condition prior to his inspection, claiming, among other things, that the car interior had not been properly swabbed for blood and that the passenger side door (which had come off after striking the tree) had been improperly reattached. Patton also reviewed Dr. Mihalakis's autopsy report and his description of the injuries, as well as Bartels's accident reconstruction report.
Based upon his examination of the vehicle and further analysis, Patton concluded that Berry, not defendant, had been driving the Cobalt at the time of the crash. As amplified in his ensuing trial testimony, Patton identified four distinct forces that were involved in the collision, namely the force of the car rotating out of its lane of travel, the impact force from striking the tree, the force that resulted from the eight-foot downward slope of the road, and the force of the bodies and objects within the car. Patton concluded that those forces jammed the driver's seat in a forward position.
Patton also considered the injuries that a driver would typically suffer when an airbag inflates. Relying on defendant's descriptions of her injuries, Patton found it significant that defendant did not suffer injuries to her eyes, nose, mouth, neck, or *185 torso area, which, in his view, was inconsistent with what would be expected if she had been the driver and the airbag had activated. By comparison, Patton found that Berry's injuries were consistent with being in the driver's seat. In particular, Patton contended that the seat had been pushed forward in the collision, and thereby accounted for Berry's injuries to his hip and knees.
Patton explained that, upon striking the tree, the Cobalt rotated in a counter-clockwise manner and redirected the forces within the car. Those redirected forces, according to Patton, caused "second impacts" within the car itself. Patton concluded that those forces and second impacts made it more plausible that Berry's body had been ejected through the passenger side window rather than through the door. Patton noted that, with Berry in the driver's seat position, his body would be expected to turn from the forces on his torso and then come "straight across" the vehicle. He further opined that defendant, who contended that she had been in a reclined position in the passenger seat, was ejected after Berry passed over her and out of the car.
Seventeen months after Dr. Mihalakis issued his autopsy report, the State requested that he provide a supplemental "consultative report" specifically addressing whether defendant or Berry was the driver of the car. Dr. Mihalakis thereafter prepared such a supplemental report, rendering a competing conclusion that defendant was indeed the driver.

B.
At trial, the State presented Detective Bartels as its first expert witness. Bartels was accepted by the court as an expert in accident reconstruction. In his direct examination, Bartels did not, however, squarely analyze whether defendant had been the driver, other than to express his opinion that "the passenger that suffered the most severe injuries would be the first to be ejected from [the] vehicle."[5]
The next expert called by the State was Dr. Mihalakis. After presenting his credentials, the prosecutor then offered him specifically as "an expert in pathological medicine." In response to that proffer, defense counsel clarified that Dr. Mihalakis was being qualified as an expert in "[p]athology only," a limitation which the trial judge confirmed. Based upon that confirmation, defense counsel stated that he had no objection to Dr. Mihalakis offering expert testimony.
Defense counsel, however, did object when Dr. Mihalakis, later in the course of his direct examination, began to describe Berry as a "passenger" in the car. Defense counsel moved to strike the medical examiner's use of that term, which resulted in the prosecution asking Dr. Mihalakis additional foundational questions. After that added foundational testimony, defense counsel renewed his objection to Dr. Mihalakis commenting that Berry was the passenger in the car, given Dr. Mihalakis's lack of qualifications in accident reconstruction.
The judge overruled these objections, determining that Dr. Mihalakis, as a pathologist, *186 was qualified to render opinions not only as to the "cause" of Berry's death, but also as to the "manner" of his death. The judge ruled that such an opinion as to whether Berry was the passenger or the driver was within the scope of the medical examiner's expertise:
Basically, as a medical examiner what he is allowed to do [is] he is allowed to give his opinion as to the cause, not only the cause, the collapse of the lung, the massive head injuries, probably the massive head injuries this guy was probably killed by, but he can also give an opinion as to the manner of death. So he can testify as to whether he was the passenger or the driver, whatever. I'll permit him to do it ...
I'm ruling as the medical examiner he hashe can and he has testified to this, he can give his opinion as to the cause [of death]. Don't have a problem with that. It's the manner of death[,] and I believe he can do that as [a] medical examiner. I will permit him to testify.
Later, the judge added:
... and [Dr. Mihalakis] is being, basically, offered as the medical examiner[,] and I ruled that he can give an opinion on how, on what the injuries were and in his opinion how they were caused, the impact and the whatever. He's not offered as an accident reconstructionist.
With defense counsel's objection having thus been overruled, the State proceeded to elicit detailed testimony from Dr. Mihalakis explaining why, in his opinion, Berry was the passenger in the vehicle and not the driver. That testimony identifying defendant as the driver followed the prosecutor's inquiry as to the "cause" of Berry's death:
Q. So, doctor, within a reasonable degree of medical certainty do you have an opinion as to what caused the injuries to Mr. Berry which resulted in his death?
A. Yes, I do.
Q. What was that doctor?
A. When the passenger side of the car struck the tree, a 20 inch in diameter tree as measured by the police, there was [a] marked incursion, meaning being pushed in. The right side of the automobile [was] up against the tree. Eventually it made a U and the police measured it. The tree was almost into the mid-portion of the car. Usually when you're talking about a car, the usual width is around five feet. So we're talking certainly almost two feet into the car. When this happened, when there were two occupants, the person that is closest to the tree is going to get struck first. So Ryan went right up against the tree, against the right side of the automobile, against the B post. The B post, there are three posts. The A post is what hold[s] up the windshield. The B post is between the front and the rear door, [and] the C post is the rear. So [the] tree went up there, struck his head, [he] suffered the lacerations[,] and the impact was so severe that the skull was essentially fragmented, [and] the face was markedly fractured.
In addition, he again went forcefully to the right, which accounts for the severe injury to the right shoulder joint. By the same token he went also forcibly to the right which accounts for the fracture of the right arm. He went forcibly to the right, [which] accounts for the fracture of the right thigh bone. And being [moved] forcefully to the right, accounts for the extensive lacerations of the liver and in the process of being j[o]stled about, [he] suffered an injury *187 which caused the laceration of the spleen. The injury, as he went forcibly to the right and rotated somewhat, accounts for the massive fracture in the ribs on the right side and to a lesser extent on the left side. And in the process because of the sudden deceleration, he flew out first. This is why he's found 15 feet away from the car.

[Emphasis added.]
Dr. Mihalakis then compared Berry's positioning within the car and his injuries to those of defendant:
The other occupant is found next to the passenger side door. The analogy is, [ ], if you think of that little [toy] where we have these metal balls hanging down and then you pull one and then the other side, the opposite ball flies off. You know. The occupant on the driver's side also came over, not only would ... the sudden deceleration force him, forcefully out of the door, out of the window, both, because the door, the window was broke and in the process he rested 15 feet away.

[Emphasis added.]
Dr. Mihalakis then presented his theory that Berry had acted as a shield, "cushioning" defendant from more serious injury:
On the other hand, the other occupant, first of all, has the passenger to act [as] interference, to run interference meaning that, you know, this person does not fly over. They have to fly across the passenger. And when you are talking about a Cobalt, you're not talking about something that has [a] generous roof. You're talking about limited space. So that the driver flies over, strikes the passenger, the deceleration and the impact hurls the passenger through, and the driver rests right in front of the passenger side door. The driver is in a way is cushioned by the passenger. This is why the driver had minor injuries compared to the passenger. In fact, the driver was able to speak with the police even.
Q. So, doctor, the injuries were sustained as a result of the location of where Mr. Berry was at, is that your opinion?
A. Of course.
[Emphasis added.]
On cross-examination, defense counsel highlighted for the jury that Dr. Mihalakis's original autopsy report had not analyzed whether defendant had been the driver at the time of the crash, but that his opinion on that subject was not detailed until he later prepared the supplemental report at the State's request. Defense counsel also questioned Dr. Mihalakis on a variety of substantive aspects of his analysis of the positioning of the occupants within the car.
Defense counsel further challenged Dr. Mihalakis's ability, as an expert limited to the subject of pathology, to give opinions on matters involving the forces applied to and within the car. However, when defense counsel attempted to ask Dr. Mihalakis on cross-examination whether he had taken any courses on accident reconstruction, the judge sustained the prosecutor's objection to that line of questioning. Nevertheless, the judge did allow defense counsel to ask Dr. Mihalakis if he had taken any courses in biomechanics, to which Dr. Mihalakis replied that he had "taken courses in accidents and some biomechanics," but did not have certificates in those subjects. Dr. Mihalakis further acknowledged that his resume does not reflect that he has taken courses in biomechanics.
On redirect examination of Dr. Mihalakis, the State brought out that the first *188 sentence of the autopsy report had described the decedent as a "passenger." The redirect examination also revealed that Dr. Mihalakis had reviewed defendant's medical records after the initial autopsy. According to Dr. Mihalakis, those records reflected that defendant's injuries from the accident were not extensive, thereby buttressing the State's overall contention that the Cobalt occupant who sustained the more serious injuries would have been the passenger, not the driver.
The defense thereafter countered the State's proofs with Patton's expert testimony, which we have previously described, as well as the testimony of several lay witnesses, including defendant herself. Defendant maintained that Berry drove the vehicle from the bar and that she had been asleep in the front-passenger seat when the crash occurred.

C.
An expert witness may testify in our courts pursuant to N.J.R.E. 702 in situations where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" In such circumstances, "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Ibid. Expert testimony must satisfy three requirements in order to be admitted at trial: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984); see also State v. Rosales, 202 N.J. 549, 562, 998 A.2d 459 (2010) (applying the three-part Kelly test); State v. Jamerson, 153 N.J. 318, 337, 708 A.2d 1183 (1998) (same).
Here, it is undisputed that the first two elements required for expert testimony to be admissible are satisfied. Our focus is upon the third element, i.e., whether Dr. Mihalakis had "sufficient expertise," see Kelly, supra, 97 N.J. at 208, 211-12, 478 A.2d 364, to testify about the movements of the two persons within the car when it crashed in amplifying for the jury his conclusion that defendant was driving the Cobalt at the time of the crash.
Significantly, Dr. Mihalakis was qualified by the trial court to testify as a pathologist, and not as an expert in accident reconstruction or biomechanics.[6] "Pathology is the specialty of medicine dealing with the causes and nature of disease." 1-1 Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialities, § 1.9 (6th ed.2011). A "forensic" pathologist, meanwhile, has been defined as an "expert in investigating and evaluating cases of sudden, unexpected, suspicious, and violent death, as well as other specific classes of death defined by law. The forensic pathologist serves the public as a coroner or medical examiner or by performing medico-legal autopsies for such officials." Ibid.
In Jamerson, supra, 153 N.J. at 337-41, 708 A.2d 1183, the Supreme Court overturned a defendant's conviction because a medical examiner had exceeded the bounds of his expertise in forensic pathology by testifying about whether a motorist involved in a fatal accident had been "reckless" in driving through an intersection. The Court held that the pathologist's testimony "should have been limited to describing the physical properties of the implement *189 that caused the [victims'] deaths, narrating the physiological status of the bodies at the time of death, and ruling out the possibility that the injuries were selfinflicted or sustained as a result of mere inadvertence." Id. at 337, 708 A.2d 1183. The Court added that "[a] forensic pathologist's testimony is [ ] restricted to describing the mechanics of death." Id. at 338, 708 A.2d 1183; cf. State v. Papasavvas, 163 N.J. 565, 606-09, 751 A.2d 40 (2000) (sustaining a conviction where a medical examiner qualified as a forensic pathologist testified, without any objection by defendant, that the cause of the victim's death was an "assault" resulting from two forms of strangulation).
Unquestionably, Dr. Mihalakis is, as defendant concedes, qualified under N.J.R.E. 702 to testify as an expert witness in forensic pathology. He has substantialindeed impressiveeducation, training, and experience in that particular discipline. He has served for decades as a county medical examiner, a position that, by statute, requires considerable responsibility, expertise, and skill. See N.J.S.A. 52:17B-83 (stating that the county medical examiner "shall be a licensed physician, of recognized ability and good standing in his community"). County medical examiners are required by law to investigate violent deaths, "whether apparently homicidal, suicidal or accidental[.]" N.J.S.A. 52:17B-86.
By contrast, Dr. Mihalakis was not qualified in this case as an expert in accident reconstruction or in biomechanics. Accident reconstructionists commonly testify about certain physical aspects of an accident such as vehicle mass, the direction of skid marks, vehicle dimensions, dents, paint transfers, road surface textures, and physics principles such as inertia, velocity, coefficients of friction, and the operating characteristics of vehicles. See Brandt v. French, 638 F.2d 209, 211 (10th Cir.1981).
Biomechanics, meanwhile, is "[t]he science concerned with the action of forces, internal or external, on the living body." Stedman's Medical Dictionary 205 (27th ed.2000). Thus, "[w]hen an outside force acts upon a living being, the biomechanical engineer applies concepts of mechanics to explain the physiological effects of that force acting upon a living being, and specifically how that force likely would affect `the normal functions of [that being] or [its] organs.'" Hisenaj v. Kuehner, 194 N.J. 6, 13 n. 5, 942 A.2d 769 (2008) (quoting Y.C. Fung, Biomechanics: Mechanical Properties of Living Tissues 1, 6 (2d ed.1993)).
As a general matter, the trial court properly allowed Dr. Mihalakis to present his opinions as a pathologist concerning the cause and manner of Berry's injuries and death. As part of that analysis, Dr. Mihalakis could testify that the tree that the Cobalt struck entered the car and came into contact with Berry's body, thereby killing him. That aspect of his testimony was consistent with Jamerson, supra, 153 N.J. at 337, 708 A.2d 1183, in that it "describ[ed] the physical properties of the implement that caused the [victims' injuries and] death[ ]." See also Smith v. BMW No. Am., Inc., 308 F.3d 913, 919-20 (8th Cir.2002) (noting that a forensic pathologist could base his opinions on the nature of the injuries that the plaintiff sustained and their causes, and could render an opinion on whether a properly-deployed airbag would have prevented those injuries).
Dr. Mihalakis's testimony went substantially beyond those permissible subjects within the domain of pathology. He presented the jury with a host of observations that delved into matters of physics and biomechanics, in a manner that transgressed *190 the scope of his qualifications. For example, Dr. Mihalakis elaborated upon the movements of the bodies and objects within the car, with multiple comments about the effect of the vehicle's "sudden deceleration," and a pointed observation that Berry's body would be unlikely to "fly across" defendant's body in the passenger seat. The medical examiner also strayed from his defined area of expertise in offering the jury his view that Berry's body had "cushioned" defendant from being propelled more violently out of the car.
Such opinions address far more than matters of pathology and the causes of injuries that Dr. Mihalakis observed in performing the autopsy of Berry and examining the photographs of the wrecked car. Instead, they explore issues within the realm of biomechanics and, to some extent, accident reconstruction. Dr. Mihalakis's opinions on these biomechanical subjects are markedly different from the permitted opinions of the medical examiner in Papasavvas, supra, 163 N.J. at 609, 751 A.2d 40, attesting that the victims' death had been caused by assaultive strangulation. The involvement and analysis of the movements of a motor vehicle and the forces inside it, distinguish this case from the facts and circumstances in Papasavvas, a one-on-one physical encounter where no automobile was involved, and where the medical examiner did not stray from his area of expertise.
Dr. Mihalakis's expert testimony was admissible to the extent he confined his opinions to the nature of the injuries and the objects that he believed had caused those injuries. Again, it was perfectly acceptable for Dr. Mihalakis to render opinions that Berry's skull was crushed by the tree. From that conclusion, he could also render an opinion without getting into the biomechanical forces within an automobileas to where Berry was sitting in the car when he suffered that injury. His opinions were inadmissible, however, when he testified about the likely movements of the occupants within the car, opining that those movements and forces were the cause of injuries and also identifying the occupants' respective locations based upon that biomechanical analysis.[7]
We recognize that scientific and technical disciplines are not airtight compartments and that the disciplines may overlap. Cf. State v. Noel, 157 N.J. 141, 149-50, 723 A.2d 602 (1999) (recognizing an overlap between expertise in bullet analysis and expertise in the process of bullet manufacturing). Even so, the degree to which Dr. Mihalakis strayed from his limited role in this case as an expert in pathology was too severe to be permitted.

D.
The trial court thus erred in overruling defense counsel's objections and allowing Dr. Mihalakis to expound upon matters beyond the scope of his expertise as a pathologist given that he lacked sufficient qualifications in biomechanics and accident reconstruction. This trial error was prejudicial to defendant for several reasons.
*191 First, although the State presented circumstantial evidence to prove that defendant was the driver, Dr. Mihalakis was the State's only expert witness to provide detailed analysis and opinions on that issue. Detective Bartels, the State's accident reconstructionist, did not provide a corroborating expert analysis in his direct examination and only touched upon that subject briefly in his cross-examination when he asserted that the Cobalt's passenger would have suffered the most severe injuries in the crash.[8]
Second, as we have already noted, defense counsel was denied the opportunity on cross-examination to explore in depth Dr. Mihalakis's limited coursework in accident reconstruction even though Dr. Mihalakis did volunteer, in response to a later question, that he was not certified in the subject.
Third, the degree of prejudice is more pronounced in this case because Dr. Mihalakis's pointed conclusion that defendant, not Berry, was the driver of the car went to the very heart of the critical disputed issue before the jury. The identity of the driver was unquestionably the ultimate issue for the jury to resolve in this case. Although expert witnesses are not categorically barred from rendering opinions on ultimate issues for the jury, see N.J.R.E. 704, the expert must still be qualified to render such an opinion. Here, Dr. Mihalakis based his opinion on the pivotal issue of where defendant was seated in the car on numerous biomechanical factors and conclusions that were beyond his expertise.
A related concern about prejudice stems from Dr. Mihalakis's status as a medical examiner. Pursuant to statute, he has significant responsibilities as a public official. We are mindful that the functions of a medical examiner have been widely portrayed to the public in news reports and, to some extent, have been glamorized in television crime shows. There is an inherent danger that the testimony of a pathologist who is also a medical examiner may be given undue weight in the eyes of jurors, at least in a case such as this, where the medical examiner lacks sufficient expertise in biomechanics or accident reconstruction to be qualified in those fields.
Finally, defendant's claim that she was the passenger when the crash occurred was not fanciful, but plausibly supported by her sworn testimony, the alleged location of her sneakers on the front passenger side, and the various opinions of her expert. This is not a case in which the medical examiner's opinions were of minor significance, but instead one in which they could have made the difference in the minds of the jurors.
Having considered these issues and the proofs as a whole, we conclude that a new trial is necessary, at which the medical examiner's expert testimony shall be confined by the constraints described in this opinion. Defendant's conviction is consequently reversed, pending any retrial.

III.
We need not analyze in depth the remaining points raised on appeal, but comment upon them briefly for the sake of completeness.
*192 We discern no reversible error in the trial court's exclusion of evidence regarding the alleged discrepancy in the numerical sequencing of the traffic summonses that, hypothetically, might have impeached the State Trooper's testimony, through another witness. This line of inquiry was collateral at best, and the trial court acted within its discretion in excluding this tangential proof under N.J.R.E. 403. See State v. Ramseur, 106 N.J. 123, 266, 524 A.2d 188 (1987). Moreover, the sequencing discrepancy may have resulted from innocuous factors.
The particular aspects of the prosecutor's summation that defendant now challenges on appeal essentially comprised fair commentary in response to defense counsel's own summation. Although the prosecutor's characterization of the Cobalt's front passenger seat as the "death seat" was vivid, it was within the bounds of "vigorous and forceful" advocacy permitted under the law. See Ramseur, supra, 106 N.J. at 320, 524 A.2d 188. The other remarks in question were similarly appropriate. The absence of any objection by defendant's trial counsel also signals that the remarks were not considered prejudicial at the time they were made. Id. at 323, 524 A.2d 188; see also State v. Echols, 199 N.J. 344, 360-61, 972 A.2d 1091 (2009).
Lastly, the proofs in this case were sufficient to rationally support a finding of defendant's guilt, although a new trial is nonetheless warranted because of the errors associated with the improper admission of the pathologist's expert opinions concerning the driver's identity and the forces and movements within the car as it crashed.
Reversed and remanded for a new trial.
NOTES
[1] The posted speed limit at that location was 45 mph.
[2] The State's witnesses contended that the sneakers were not moved and, in fact, had been located on the driver side floor when they were first seen by the responding officers.
[3] We have not been furnished on appeal with the autopsy report, Dr. Mihalakis's ensuing consultative report, the detective's accident reconstruction report, or the report of defendant's expert in biomechanics and accident reconstruction. Those reports were not admitted into evidence at trial, except insofar as portions of them were read into the record during the examination of their authors.
[4] There are no photographs of the location of the driver's seat after the accident.
[5] This brief allusion to Berry as the "passenger who suffered the most severe injuries" (emphasis added) did not provide a definitive opinion for the jury that defendant was the driver because there were only two occupants in the vehicle, and thus there could be only one "passenger." Bartels's trial testimony on this point could reasonably be construed as an inadvertent use of the term "passenger" for "occupant." In his written report, as quoted from during his testimony, Bartels apparently was more definitive, alluding to Berry as the "right front seat passenger."
[6] We acknowledge that some pathologists have been sufficiently trained and have sufficient experience to also qualify as experts in accident reconstruction and biomechanics.
[7] The prosecution cites in its brief to State v. House, 481 A.2d 1129, 1134 (Me.1984), in which a forensic pathologist permissibly opined about who was driving a vehicle at the time of an impact. The pathologist based his findings upon an autopsy and photographs of an accident. However, in that case the medical examiner's opinion was corroborated by the analysis of a separate expert in accident reconstruction. Id. at 1131. The present case is also distinguishable because of Dr. Mihalakis's substantial commentary about issues of biomechanics that went beyond his own expertise.
[8] Notably, Dr. Mihalakis did not testify that he specifically relied upon Bartels's opinion as to the passenger's identity and instead rendered his own independent opinions on that subject. Cf. N.J.R.E. 703 (allowing experts to rely upon facts and data "reasonably relied upon by experts in the particular field"); N.J.R.E. 808 (allowing experts, within certain hearsay-based limitations, to rely upon opinions of other experts who examined the matter); State v. Matulewicz, 101 N.J. 27, 30, 499 A.2d 1363 (1985) (limiting such reliance where the other expert's opinion is sufficiently complex or where the methods and circumstances involved weigh against such reliance).