**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3628-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RAPHAEL LOLOS, a/k/a
RALPH LOLOS, and
RALPHAEL LOLOS,

     Defendant-Appellant.

_____

Submitted October 23, 2023 – Decided March 28, 2025

Before Judges Gilson and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-11-1499.

Joseph E. Krakora, Public Defender, attorney for appellant (Stephen W. Kirsch, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Jaimee M. Chasmer, Assistant Prosecutor, of counsel and on the brief; John J. Scaliti, Legal Assistant, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Defendant Raphael Lolos appeals from the February 19, 2020 judgment of conviction (JOC) entered after a jury convicted him of the first-degree murder of his girlfriend and twenty-eight other crimes. We affirm.

I.

We derive the following from the trial testimony. Jenny Londono was the manager and promoter of Luna Lounge in Englewood. Defendant was Londono's boyfriend. Although defendant assisted Londono in opening the lounge in June 2017, he was not on the lease and had no authority to act on behalf of the business.

Gladys Quintero was Londono's mother and Kenny Rodriguez Quintero was her brother. Gladys[1] testified defendant and Londono first became romantically involved in 2016, and initially, defendant treated Londono well. Gladys said defendant proposed to Londono and gave her a ring in December 2016. Londono, however, told Kenny the ring was not an engagement ring.

---

[1] Because the Quinteros share a surname, we refer to them by their first names to avoid confusion. No disrespect is intended.

A-3628-19

According to Gladys, defendant was bothered by Londono's relationship with her former boyfriend Estevenson Rodriguez and questioned why they remained in touch. In April 2017, defendant spotted Londono with Rodriguez in a car and followed them. He later angrily confronted Londono, who lied about where she had been.

Gladys and Kenny traveled with defendant and Londono on a May 2017 overnight trip to Atlantic City. During the trip, defendant was not happy when Londono was dancing with other people at a pool party. They argued over that and did not speak to each other the next day. Gladys believed the relationship between the two was "very bad" in June 2017 due to defendant's jealousy.

According to B.J. Santos, who was in charge of security at Luna Lounge, defendant was "always watching" Londono, and would follow her from room to room at the establishment. Defendant asked Santos to let him know if Londono's former boyfriend appeared at Luna Lounge.

In February or March 2017, Gladys loaned defendant her Honda CR-V. Gladys drove Londono's white Infiniti, while Londono drove a Mercedes Benz SUV given to her by defendant. Gladys had an EZ Pass transponder affixed to the license plate of the Honda. On June 25, 2017, Gladys texted defendant to ask him to pay EZ Pass tolls incurred while he was in possession of the Honda.

A-3628-19

On June 24, 2017, Gladys and Kenny brought supplies to Luna Lounge for a barbeque with Londono planned for the next day. Defendant was not invited to that event. Gladys and Kenny left the lounge around 6:30 p.m. Although Gladys intended to return, she fell asleep when she got home. She spoke to Londono at approximately 3:00 a.m. the next day.

During the early morning hours of June 25, 2017, Danny Echavarria spent time with Londono and defendant, both of whom he knew socially, at Luna Lounge. Echavarria was interested in Londono romantically and was not aware she and defendant were in a relationship.

At approximately 6:30 a.m., Echavarria, Londono, and defendant were seated together at a table at the lounge. During a twenty-minute conversation, Londono, who was intoxicated, told Echavarria she was sad because she had been "disappointed in love" with Rodriguez. Defendant, who did not appear intoxicated, was listening, but said nothing.

Between 7:30 a.m. and 8:00 a.m., the trio and an employee left the lounge. Echevarria exited first and waited for Londono, hoping to invite her to breakfast. He heard defendant and Londono arguing inside and watched as they exited the lounge together and headed towards the parking lot. When they were halfway

to the parking lot, Echevarria heard Londono say, "Raphael, stop," followed by a car door slamming. Echevarria did not see an Uber vehicle outside the lounge.

At approximately 1:40 p.m., Giovanna Ferrer, a bartender at Luna Lounge, texted with Londono, and then at 1:48 p.m. they spoke on the phone. Londono told Ferrer the lounge would be opening later than usual that day, and she would call Ferrer to let her know when. Ferrer never heard from Londono again.

At approximately 2:30 p.m., Gladys and Kenny arrived at Luna Lounge for the barbeque, but Londono was not there. Her car was in the parking lot and the lounge was locked. Both Gladys and Kenny called Londono but got no answer. They also repeatedly texted her but received no response until 6:01 p.m. when Gladys received a text from Londono's phone stating, "I'm with some girlfriends. I'll call you later." Kenny then received two texts from Londono's phone which read, "Stressed out. Busy. I'll call later[,]" and "I'm not opening today. Call [defendant]. I'll be back – I left. Will be back Tuesday." According to Kenny, the texts were dissimilar to Londono's normal writing style. Neither Gladys nor Kenny received another message from Londono's phone.

Gladys called defendant, who told her Londono left Luna Lounge that morning in an Uber vehicle with $10,000 in cash. He said he tried unsuccessfully to stop the Uber vehicle. Defendant stated Londono was stressed

5

and suggested she was with friends, at a spa, or on a trip, possibly with Rodriguez. Gladys did not believe defendant because Londono always told Gladys of her travel plans in advance. Defendant said he had the keys to the lounge and would look for Londono.

Prior to speaking to Gladys, between 2:00 p.m. and 5:00 p.m., defendant repeatedly tried to contact his cousin Demetrious Lolos, who had experience repairing cell phones. Defendant arranged to meet Demetrious[2] in the parking lot of Londono's apartment building in Edgewater. When Demetrious arrived sometime after 5:00 p.m., defendant showed him Londono's phone, which defendant was touching constantly to keep "awake," and asked him for help to permanently unlock the phone.

Defendant told Demetrious he had taken the phone and used Londono's finger to unlock it while she was sleeping. Defendant said he wanted to see if Londono was communicating with a prior boyfriend. Defendant told Demetrious Londono had gone to Luna Lounge to look for her phone, and he intended to hide it under sofa cushions in her apartment for her to find later.

---

[2] Because Demetrious has the same surname as defendant, we refer to him by his first name. No disrespect is intended.

Demetrious told defendant he could not help him, refused to take the phone which defendant repeatedly offered to him, and left. Shortly after 6:00 p.m., defendant made two Google searches – "how to kill yourselph (sic)" and "how to kill yourself" – while connected to the router in Londono's apartment.

Surveillance video and credit card receipts establish that between 7:00 p.m. and 8:00 p.m., defendant used Londono's American Express credit card to purchase: (1) a box of Hefty trash bags, napkins, and paper plates at a supermarket in Edgewater; and (2) an Oster meat cleaver, a Kitchen Aid meat cleaver, Nivea hand cream, Secret deodorant, a salt-and-pepper set, a cutlery set, and flatware at a Target in North Bergen. License plate readers maintained by the New York City Police Department captured the Honda crossing the George Washington Bridge into Manhattan at 9:41 p.m. and then back into New Jersey at 10:14 p.m.

On June 26, 2017, between 10:30 p.m. and 11:00 p.m., defendant visited a restaurant in Fort Lee, where he told manager Cesar Cruz that he wanted to jump off the George Washington Bridge (GWB). Defendant said, "You don't know the problems that I have." Cruz did not take defendant's threat seriously.

Defendant also told Cruz, while patting his pocket, that he had $20,000 and could give Cruz a loan if he needed one. According to Cruz, defendant

7

seemed nervous. Defendant bought drinks for people in the bar using Londono's credit card.

On June 27, 2017, and June 28, 2017, defendant operated Luna Lounge with the help of Ferrer after advising her Londono was missing. Defendant told Ferrer: (1) he gave Londono $10,000 on June 24; (2) she became annoyed with him and left in an Uber vehicle on the morning of June 25; (3) he tried to follow the Uber vehicle but could not cross the GWB because he did not have EZ Pass; and (4) he suspected Londono was in Miami with other men. Defendant also told Ferrer he had spoken with Gladys who told him not to worry because Londono frequently took vacations without telling anyone. When Ferrer told defendant she did not believe him because she had spoken to Londono on June 25, defendant became "super serious" and asked to see proof of the call.

Ferrer testified that on June 28, 2017, she looked into Londono's Mercedes in the Luna Lounge parking lot, and saw makeup, clothing, and shoes. She thought Londono was not likely to have left those items behind. She also testified that although defendant told her he followed the Uber vehicle to the GWB, but did not cross into New York, the following day he told her that he followed Londono to Brooklyn after she left Luna Lounge.

Also on June 28, 2017, defendant met with party promoter Sandro Morales. He told Morales he was in charge of Luna Lounge because Londono had gone to Colombia due to a "family emergency" because "someone had died."

At about 4:00 p.m. on June 28, Gina Henriquez, a representative of the owner of Luna Lounge, stopped by looking for Londono, who had not been answering her calls and was due to file a daily report on the business. Henriquez found defendant running the lounge and discovered $6,000 in cash was missing from the weekend's receipts. According to Henriquez, defendant stated that: (1) he did not know where Londono was; (2) it was possible she was in Miami; and (3) he believed Gladys knew where Londono was but would not tell him. Defendant was upset, crying, and chain smoking. Henriquez directed defendant to close Luna Lounge because he did not have authority to operate the business in Londono's absence. Defendant was unhappy with Henriquez's directive.

Meanwhile, on June 27, 2017, a couple walking their dog along the river in Red Hook, Brooklyn, spotted a portion of a woman's body, from the waist to the knees, in the water. They called 911.

Detective Oleg Uruymagov of the New York City Police Department responded to the scene. After the remains were removed from the water, police

discovered a tattoo reading "Lilian" on the right hip. They later released this information to the public.

On July 1, 2017, and July 19, 2017, respectively, a left lower leg, and a right lower leg were discovered on the New York side of the Hudson River.

On June 28, 2017, Gladys saw a news report about the discovery of the dismembered remains in Brooklyn. After seeing the tattoo, she grew concerned that the body belonged to Londono. She and Kenny met defendant outside the Luna Lounge that evening, and when Gladys told him of her concerns defendant started yelling and crying. Gladys told him to stop, as his reaction was premature, and asked him to drive her and Kenny to Brooklyn.

During the trip, defendant drove erratically while sweating and chain-smoking. He was angry when they received phone calls from others who had seen the news report.

The trio arrived at a Brooklyn police station at 10:30 p.m. While they waited, defendant continued to chain smoke, sweat, and behave in a nervous and worried manner. He told Gladys he wanted to leave because they were wasting their time. Uruymagov eventually spoke to the three separately. He collected screen shots of the June 25 texts from Londono's phone to Gladys and Kenny.

A-3628-19

According to Uruymagov, defendant told him he last saw Londono on June 25 at Luna Lounge, which he claimed they owned together. Defendant stated that: (1) Londono gave him the keys to the lounge at 10:00 p.m. on June 24 so that he could open up the business the next day; (2) the pair stayed at the lounge overnight drinking and having sex; (3) at 5:00 a.m. Londono got a text and at 5:10 a.m. they went outside; (4) a black Uber vehicle with New York plates, a male driver, and two female passengers pulled up; (5) Londono got in the vehicle, which sped away; and (6) he followed the vehicle to the GWB in the Honda, but was forced to stop because he did not have an EZ Pass transponder. Defendant identified the hip tattoo on the remains as Londono's.

Defendant was nervous and chain smoking as he told his story, and then became agitated and angry, waving his hands, when Uruymagov asked follow-up questions. Defendant said he wanted to leave, refused to comply when Uruymagov asked him to stay, and exited the building.

Between July 1, 2017 and July 4, 2017, defendant repeatedly used Londono's credit card at a gentlemen's club in Linden. He spoke with bartender Jadrienne Znidarsic, who recalled defendant was crying and very emotional. Defendant told Znidarsic he had lost the "love of his life," his "fiancé," to

11

ovarian cancer two weeks earlier. He also told her he had to "find someone and get revenge."

The police confirmed through DNA testing that all the recovered remains were Londono's. They retrieved surveillance video from Luna Lounge, which showed: (1) defendant and Londono walking towards the Honda at about 8:00 a.m. on June 25, 2017; and (2) defendant returning alone to Luna Lounge at about 4:00 p.m., and retrieving items, including possibly a moneybag, from the lounge. Police also obtained Uber records which revealed no Uber vehicle was sent to Luna Lounge for a pick-up on the morning of June 25 and confirmed an EZ Pass transponder was mounted on the front license plate of Gladys's Honda.

On July 6, 2017, police arrested defendant in his room at a Linden motel. They searched defendant and the room and seized his Apple iPhone. Defendant had multiple credit cards in Londono's name in his possession. Police also found: (1) Londono's social security card; and (2) a blue Post-It note with Londono's name, birthday, and address. They photographed receipts found in the room, including from a Linden Walmart, and the Taboo Gentlemen's Club.

During a July 7, 2017 search of Londono's apartment, police found: (1) Bounty napkins and paper plates; (2) a June 27, 2017 check from Londono's business account in the amount of $5,500 payable to defendant; (3) a Hefty

12

garbage bag box under the kitchen sink containing fourteen of twenty-eight bags; (4) two additional loose garbage bags in the bathroom; and (5) an unpackaged Oster meat cleaver, an unopened Kitchen Aid meat cleaver and an unopened Farberware knife set. They seized the traps from the kitchen and bathroom sinks and the shower, and swabbed the side and rear bathroom walls for DNA testing. Londono's cell phone was not recovered.

Subsequent DNA testing of blood on the Oster meat cleaver revealed a mixture of two contributors, the major one of which was Londono, while the minor one could not be identified. Testing of DNA samples from the rear bathroom wall revealed two contributors, the major one being Londono.

Police also discovered defendant had been tracking Londono using a battery-operated Spytech GPS tracking device which he had fixed to the rear tow-hitch of her Mercedes. He purchased the device on June 13, 2017, using one of Londono's credit cards, and began receiving location information through an application on his phone starting June 14, 2017.

A grand jury indicted defendant, charging him with: (1) first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); (2) second-degree desecration of human remains, N.J.SA. 2C:22-1(a) (count two); (3) third-degree hindering, N.J.S.A. 2C:29-3(b)(1) (count three); (4) third-degree stalking,

N.J.S.A. 2C:12-10(e) (count four); (5) twenty-one counts of third-degree fraudulent use of credit cards, N.J.S.A. 2C:21-6(h) (counts five through eight, ten through fifteen, seventeen through twenty-two, and twenty-four through twenty-eight); (6) fourth-degree theft by deception, N.J.S.A. 2C:20-4 (count nine); (7) third-degree theft by deception, N.J.S.A. 2C:20-4 (count sixteen); and (8) third-degree impersonation, N.J.S.A. 2C:21-17(a)(2) (count twenty-nine).

At trial, Ferrer testified that, two weeks before Londono's disappearance, she was with Londono and defendant at Luna Lounge. She and Londono were working and defendant was watching Londono. Londono asked defendant to leave but he silently shook his head "no." After Londono repeated her request, she and defendant went into a back room and began to argue. Ferrer heard Londono crying and went to the room to ask if she was okay, but defendant yelled at her to leave.

Ferrer remained where she was and told Londono to come back out into the main bar area. All three then exited the back room and Londono again asked defendant to leave before going outside to the patio. According to Ferrer, defendant later apologized to Ferrer and said he did not "want anyone else to look at" or talk to Londono. Ferrer had previously observed defendant watching Londono at the lounge.

A week later, defendant again came into the lounge while Ferrer and Londono were working. Ferrer testified that defendant was furious, red-faced, and sweating. He demanded Londono give him her phone and password. Londono refused, stating that her phone and password were private. Londono walked away and defendant followed her, insisting he needed her phone and to talk to her. Londono began to cry and eventually told defendant to leave.

Special Agent Agit David of the Federal Bureau of Investigation (FBI), an expert in historical cell site analysis, testified he analyzed the cell site data associated with the call/text records of both defendant and Londono. He explained that a cell phone user's location can be approximated by call detail records kept by the service provider showing which cell phone tower was utilized for each call or text.

David determined, based upon the calls and texts made and received by defendant's phone and Londono's phone, that both phones were in the vicinity of Londono's Edgewater apartment throughout the day and up until approximately 7:00 p.m. on June 25, 2017, except for a brief time around 4:00 p.m. when both phones were in the area of Luna Lounge. At 6:55 p.m. Londono's phone ceased communicating with cell towers.

A-3628-19

At 7:07 p.m. and 8:00 p.m., respectively, defendant's phone connected with cell towers in Edgewater and North Bergen.  At 9:25 p.m., defendant's phone connected with a cell tower in Edgewater, and then three minutes later with a tower in Fort Lee.  Defendant was in the Fort Lee area from 10:18 until 11:34 p.m.

David testified defendant's iPhone contained a GPS receiver that recorded the phone's location based on GPS satellite data, i.e., longitude and latitude coordinates.  Because defendant had activated the "location services" on his phone, these coordinates could be found in his "favorite locations" log.

David reported the extracted GPS coordinates stored on defendant's iPhone confirmed his presence in the area of Londono's apartment between 7:34 a.m. and 3:30 p.m. on June 25, at Luna Lounge at 4:00 p.m., and then back at her apartment between 4:45 p.m. and 7:00 p.m.  Between 7:16 p.m. and 7:27 p.m., defendant was at a supermarket in Edgewater.  He returned to Londono's apartment between 8:16 p.m. and 9:12 p.m., and then was in the Fort Lee area between 10:18 p.m. and 11:34 p.m.

Detective Michael Palumbo of the Bergen County Prosecutor's Office testified as an expert in digital forensics.  He read into the record extensive text messages between defendant and Londono from March through June 2017 that

16

were extracted from defendant's phone and which revealed defendant's: (1) jealousy and insecurity regarding Rodriguez; (2) belief that Londono was involved with Rodriguez or other men; and (3) anger and despair that Londono had decided to take a step back from their relationship at the end of May, 2017. Palumbo also noted that, while defendant sent a few text messages to Londono in the days following June 25, the texts were not in keeping with his prior relentless attempts to communicate with her.

Medical examiner Sean Kelly conducted an autopsy of Londono's remains and concluded the manner of her death was homicide, and the cause of death was "homicidal violence of undermined type with dismembered remains." He reached this conclusion based on "all the information and evidence [he] had" including the absence of a history of Londono having suicidal tendencies or significant natural disease, the absence of high levels of drugs in Londono's remains, and the fact the dismemberment reflected an attempt by another party to conceal what had happened to Londono. Kelly further opined that Londono's body was dismembered after she was dead using a non-serrated blade, and that fractures in her pelvic bones were post-mortem and could have been caused by a fall into water from a great height.

A-3628-19

Forensic anthropologist Christopher Rainwater testified that V-shaped defects in Londono's bones indicated she was dismembered using a non-serrated blade such as a knife or cleaver in a hacking or chopping motion. He noted there was no pre-death trauma to Londono's bones and breaks in her pubic bones and tail bone could have resulted from a fall from great height or a boat strike.

Criminologist Antonio Liberta of the New York City Office of the Chief Medical Examiner (OCME) tested a cervical swab from Londono's remains utilizing autosomal STR testing, which looked at both the X and Y chromosomes, and determined there was DNA from two contributors. Ninety-five percent of the DNA in the sample was female and five percent was male. Based upon his testing, it was 5,370 times more probable that the male DNA contained in the sample originated from someone other than defendant than from defendant. Liberta did not perform Y-STR testing, which looked only at a section of the Y chromosome because there was not enough male DNA.

DNA analyst Christina Nash testified that, in the fall of 2018, her employer, Bode Technologies (Bode), a private genetic lab, was retained by the prosecutor to perform DNA testing on two cervical swabs from Londono's remains. Nash performed Y-STR testing, explaining the test was most helpful when samples were retrieved from inside a female body and were mostly

comprised of female DNA, as was the case here. Nash's testing of a swab from inside Londono's vagina revealed two contributors, the major one of which was consistent with the profile of Rodriguez, while the minor one was consistent with defendant's profile. Her testing of a second swab also revealed two contributors, but only Rodriguez could be identified as the major contributor.

Customs officer Daniel Rothman testified that passport records reflected Rodriguez left the country from a Houston airport on June 24, 2017, and traveled to Mexico. He returned to Newark Liberty International Airport on July 2, 2017.

At the close of the State's case, defendant moved for a judgment of acquittal. The trial court denied the motion, finding the State produced sufficient circumstantial evidence that defendant murdered Londono and disposed of her body on which a jury could convict him of murder.

Defendant did not testify or present witnesses.

The jury convicted defendant on all counts in the indictment. A bifurcated trial was held with respect to one element of the third-degree stalking charge – whether defendant was on probation at the time he stalked Londono. The jury returned a verdict of guilty on third-degree stalking.

Defendant thereafter moved for a judgment of acquittal notwithstanding the verdict. The court denied that motion.

At sentencing, the court merged counts five through twenty-eight into count twenty-nine and sentenced defendant to: (1) life imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count one (murder); (2) a concurrent ten-year term of imprisonment on count two (desecration of human remains); (3) a concurrent five-year term of imprisonment on count three (hindering); (4) a concurrent five-year term of imprisonment on count four (stalking); and (5) a consecutive five-year term of imprisonment on count twenty-nine (impersonation). Defendant's aggregate sentence is life in prison, subject to NERA, plus an additional five-year term. A February 19, 2020 JOC memorialized defendant's convictions and sentence.

This appeal follows. Defendant raises the following arguments.

> POINT I
>
> THE MOTION FOR A JUDGMENT OF ACQUITTAL ON MURDER SHOULD HAVE BEEN GRANTED. AS IN STATE V. LODZINSKI, [249 N.J. 116 (2021),] THERE WAS NO ACTUAL EVIDENCE IN THE CASE THAT DEFENDANT MURDERED THE VICTIM.
>
> POINT II
>
> THE MEDICAL EXAMINER IMPROPERLY OPINED THAT THE CAUSE AND MANNER OF DEATH WAS VIOLENT "HOMICIDE."

20

POINT III

CONTRARY TO THE TRIAL JUDGE'S RULING, EXPERT TESTIMONY REGARDING THE WAY APPLE COMPILES SUPPOSED "LOCATION" DATA IN AN IPHONE WAS REQUIRED TO ADMIT THAT DATA INTO EVIDENCE; INSTEAD, NUMEROUS WITNESSES SIMPLY REPEATED THAT LOCATION DATA FOR THE JURY TO HEAR WITHOUT PROVIDING ANY WAY FOR THE JURY TO EVALUATE ITS RELIABILITY OR THE METHODOLOGY BY WHICH IT WAS ASSEMBLED.

POINT IV

THE DEFENDANT'S THREAT TO KILL HIMSELF – WHICH BOTH THE JUDGE AND THE WITNESS TESTIFYING TO IT CONCLUDED WAS NOT REAL – AND DEFENDANT'S TWO INTERNET SEARCHES ON HOW TO KILL ONESELF WERE IMPROPERLY ADMITTED TO DEMONSTRATE CONSCIOUSNESS OF GUILT WHEN ONLY ACTUAL SUICIDE ATTEMPTS ARE ADMISSIBLE ON THAT BASIS UNDER STATE V. MANN[, 132 N.J. 410 (1993)].

POINT V

THE MATTER SHOULD BE REMANDED FOR A HEARING TO DETERMINE IF THE RULING IN STATE V. ROCHAT[, 470 N.J. SUPER. 392 (APP. DIV. 2022),] REGARDING THE INADMISSIBILITY OF LOW-COPY NUMBER (LCN) DNA TESTING APPLIES TO THE DNA TESTING THAT WAS DONE HERE; THE RECORD IS UNCLEAR WHETHER LCN DNA WAS INVOLVED. (NOT RAISED BELOW).

21

POINT VI

THE CONVICTION FOR THIRD-DEGREE STALKING SHOULD BE REVERSED BECAUSE: (1) THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CHARGE; (2) THE JURY'S VERDICT ON THAT COUNT WAS OBTAINED BY COBBLING TOGETHER PARTIAL VERDICTS AT TWO TRIALS; AND (3) THE SECOND OF THOSE TRIALS WAS MISSING MANY OF THE PROCEDURAL PROTECTIONS OF A NORMAL BIFURCATED TRIAL. (PARTIALLY NOT RAISED BELOW).

## II.

A.    Denial of Motion for Judgment of Acquittal.

We review a denial of a motion for a judgment of acquittal de novo. State v. Williams, 218 N.J. 576, 593-94 (2014); State v. Brown, 463 N.J. Super. 33, 47-48 (App. Div. 2020). The motion will be denied "if 'viewing [only] the State's evidence in its entirety, be that evidence direct or circumstantial,' and giving the State the benefit of all reasonable inferences, 'a reasonable jury could find guilt . . . beyond a reasonable doubt.'" State v. Sugar, 240 N.J. Super. 148, 152 (App. Div. 1990) (alteration in original) (quoting State v. Reyes, 50 N.J. 454, 458-59 (1967)). The beyond a reasonable doubt standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony,

22

to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Under Rule 3:18-1, when deciding a motion for a judgment of acquittal, the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

Defendant argues a judgment of acquittal was warranted because the State produced no "actual" evidence he murdered Londono. According to defendant, the State presented only circumstantial evidence of motive, opportunity, and consciousness of guilt that was consistent with its theory of the case but insufficient for a conviction.

We have reviewed the record and find no basis on which to reverse the trial court's denial of defendant's motions for a judgment of acquittal. To sustain a conviction for murder, the State was required to present evidence that: (1) defendant caused Londono's death or serious bodily injury resulting in death; and (2) did so purposely or knowingly. Model Jury Charges (Criminal), "Murder (N.J.S.A. 2C:11-3(a)(1) and 3(a)(2))" (Rev. June 14, 2004). In presenting its

case to a jury, the State is permitted to rely entirely on circumstantial evidence, and is not required to offer direct evidence of a defendant's guilt, as long as it proves the elements of the offense beyond a reasonable doubt. State v. Lodzinski, 249 N.J. 116, 146 (2021). "[I]n many situations circumstantial evidence may be 'more forceful and more persuasive than direct evidence.'" State v. Mayberry, 52 N.J. 413, 437 (1968) (quoting State v. Corby, 28 N.J. 106, 119 (1958)). "So long as the evidence is of sufficient quality to generate in the minds of the jurors a belief and conviction of guilt beyond a reasonable doubt, it matters not whether direct evidence of guilt is present." State v. Rogers, 19 N.J. 218, 234 (1955).

The record contains strong circumstantial evidence defendant murdered Londono. That evidence included defendant's: (1) history of jealousy and possessiveness as to Londono; (2) presence when Londono told Echavarria she was sad because she had been "disappointed in love" with Rodriguez on the day she disappeared; (3) repeated lies about Londono's departure from the Luna Lounge in an Uber vehicle and his inability to follow the vehicle across the GWB because he had no EZ Pass transponder; (4) possession of Londono's phone, attempt to bypass her passcode, and apparent use of the phone to communicate with Gladys and Kenny while pretending to be Londono; (5)

purchase of a meat cleaver subsequently found to be stained with Londono's blood; (6) trips across the GWB; (7) statements and actions reflecting suicidal ideation; (8) lies about Londono to Ferrer, Morales, and Henriquez; (9) reaction to Gladys's revelation of the tattooed remains in New York; (10) behavior at the Brooklyn police station; (11) behavior and statements at the gentlemen's club; (12) attempts to run the Luna Lounge after Londono's disappearance; (13) stalking of Londono; and (14) the testimony confirming that the dismemberment of Londono's body was done with a knife or cleaver.

The evidence identified defendant as the perpetrator and established the requisite intent for first-degree murder. State v. Colleia, 206 N.J. 274, 293-94 (2011); State v. Williams, 190 N.J. 114, 124-25 (2007). Defendant's post-murder conduct aimed at concealing and covering up Londono's murder was particularly persuasive. See State v. Smith, 669 N.W.2d 19, 26-28 (Minn. 2003) (evidence that a defendant dismembered a victim's body and sought to dispose of it constituted relevant evidence to show not only that the defendant's homicidal act was premeditated, but also his contempt for the victim); Schexnider v. State, 943 S.W.2d 194, 201-02 (Tex. Ct. App. 1997) (dismemberment of a victim's body "is hardly the action of an innocent accused" and goes to establish defendant's intent).

We are not persuaded by defendant's argument that <u>Lodzinski</u> requires reversal of his murder conviction. Contrary to defendant's argument, the <u>Lodzinski</u> Court did not hold that "actual" or "direct" proof of participation in a murder was necessary for a conviction. Rather, the Court reaffirmed that circumstantial evidence alone could be sufficient to support a murder conviction. <u>Lodzinski</u>, 249 N.J. at 146.

Nor does the rationale for reversing the murder conviction in <u>Lodzinski</u> warrant reversal of defendant's murder conviction. In <u>Lodzinski</u>, the Court reversed the defendant-mother's conviction of murdering her five-year-old son nearly two decades after the child's death. <u>Id.</u> at 119-22. The Court held that even if the evidence adduced at trial arguably supported the conclusion the defendant was involved in her son's death, that evidence was insufficient to prove she had purposefully and knowingly killed him. <u>Id.</u> at 121, 147-56. In so ruling, the Court emphasized that: (1) the key physical evidence on which the State relied, a blanket found near the child's body, could not be traced to the defendant or her home; and (2) the motive evidence was "based on questionable tropes and stereotypes about single working mothers." <u>Id.</u> at 147-55.

By contrast, here: (1) forensic DNA evidence linked defendant to the murder, including Londono's blood on a cleaver defendant purchased the day

Londono disappeared and found in Londono's apartment; (2) defendant's story about Londono's disappearance is contradicted by cellphone evidence; (3) motive evidence established defendant's anger, jealousy, and hostility toward Londono; (4) evidence established defendant stalked Londono in the weeks leading up to her disappearance; and (5) defendant committed post-murder acts and made post-murder statements demonstrating consciousness of guilt.

B.    Medical Examiner's Testimony As To Manner and Cause of Death.

Defendant argues the trial court erred when it permitted Kelly to offer the expert testimony that the cause and manner of Londono's death was a violent homicide. According to defendant, Kelly's testimony was inadmissible because he offered an opinion with "no conceivable scientific basis" and which was not beyond the ken of the average juror.

The State argues defendant did not object to the admission of Kelly testimony at trial and raised the issue for the first time on appeal. Defendant argues that he did object at trial. Where a defendant did not object to the admission of evidence at trial, we review the record under the plain error standard for an error "clearly capable of producing an unjust result . . . ." State v. Whitaker, 200 N.J. 444, 465 (2009) (quoting R. 2:10-2). "Not any possibility of an unjust result will suffice as plain error, only 'one sufficient to raise a

reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Coclough, 459 N.J. Super. 45, 51 (App. Div. 2019) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

However, where an objection has been raised, we review a trial court's evidentiary rulings with deference. State v. Hyman, 451 N.J. Super. 429, 441 (App. Div. 2017). "[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). An abuse of discretion is found only when the court has made a "clear error of judgment." State v. Koedatich, 112 N.J. 225, 313 (1988). The court's evidentiary decision should be sustained unless it resulted in a "manifest denial of justice." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

Therefore, we first address whether defendant objected to Kelly's testimony at trial. At the outset of his direct examination, Kelly testified without defense objection that the manner of Londono's death was homicide and that the cause of her death was "homicidal violence of undetermined type with dismembered remains." Thereafter, when the assistant prosecutor attempted to admit into evidence the death certificate signed by Kelly, which includes his opinion as the manner and cause of Londono's death, defense counsel objected.

Defense counsel argued admission of the death certificate was improper because Kelly had not yet testified as to the basis for his opinion. The trial court overruled the objection, finding the death certificate to be a self-authenticating public document. In addition, the court found that admission of the death certification would not prejudice defendant because Kelly had already testified as to his opinion with respect to the manner and cause of Londono's death.

At the conclusion of Kelly's direct testimony, the following colloquy occurred:

> [Assistant Prosecutor]: Now Doctor, your final diagnosis and opinion in this case was the cause of death was homicidal violence of undetermined type, and the manner of death was homicide. Not having Jenny Londono's entire body, and with everything you observed, how . . . is it that you made that final determination, or why did you make that final determination?
>
> [Kelly]: Um, I came to that opinion after reviewing every – you know, all the information and evidence that I had, because there did not appear to be any history of any significant natural disease that would explain her death. I did not detect any high levels of any drugs or intoxicants that would explain her death.
>
> Her body was dismembered, or cut into pieces, and then those parts of her body were somehow deposited into the waterways surrounding New York where they were later recovered. So there . . . appeared to be some attempt to conceal or hide those portions of her body after she had been dismembered. And so in my opinion,

given that information, I felt that, you know, she didn't accidentally get cut up or cut herself up and . . . put herself in the river. Somebody else appeared to have done these things to her.

Defendant did not object to this testimony.

Prior to cross-examination, defense counsel renewed the objection to the admission of the death certificate, distinguishing between the admission of Kelly's opinion testimony and admission of the death certificate. Defense counsel argued they would have an opportunity to cross-examine Kelly and the jury would be free to accept or reject his testimony, but a manner and cause of death on the death certification would "go[] from being an opinion . . . to . . . being a fact."

Subsequently, on cross-examination, Kelly testified his conclusion as to Londono's cause of death was an opinion, not an assumption, as it was "based on the fact that I don't have any other explanation for her to be dead, and dismembered, and discarded into the river." He acknowledged that without the rest of Londono's body he could not definitively rule out other ways she could have died. The trial court decided to redact the manner and cause of death from the death certificate, but noted defense counsel did not have an objection to Kelly testifying to his opinion with respect to the manner and cause of death.

30

During cross-examination, Kelly acknowledged that, in his initial report, his opinion also included findings of "acute gamma hydroxybutyric acid (ketone) intoxication" and "recent amphetamine and fentanyl use" as a cause of death.  However, Kelly removed those opinions from his final report because: (1) although a urine screen initially detected fentanyl and amphetamines, Kelly later deemed the screen to have produced a false positive because subsequent testing did not confirm the presence of these substances; and (2) further review indicated that Londono's ketone level was "nowhere near the levels that are typically seen in a fatal intoxication."

On re-direct, Kelly testified his opinion was based in part on "minor contusions of thigh and left buttock" because several of the contusions "appeared fresh or recent, and suggested the possibility of some type of altercation."  He further explained his opinion that Londono's death was a homicide due to homicidal violence of an undetermined type as follows:

> Well, I – I don't have anything that shows up in the toxicology studies that indicates that she died of any type of overdose or intoxication.  I don't have any history or findings consistent with any type of natural disease that would have caused her death, or any explanation for why she would be dismembered and discarded in a way to conceal her death if she had died of a natural cause.  I did not have any evidence that she would have intentionally taken her life and then had

someone dismember and discard her body in an attempt to conceal her death.

So in – in my experience, cases where the body is dismembered and the body parts are then either disposed of or concealed in a manner to hide the death or conceal the death, these cases have been homicides unless there's some other explanation for why the body would be dismembered, or transported from one location to another, or concealed for some reason.

So given these points, like I said in my opinion, this appeared to be some type of homicidal act that resulted in her death, with subsequent dismemberment and then attempts to conceal those parts of her body to cover up or hide the fact that she had been murdered.

Defense counsel did not object to this testimony.

We conclude defendant did not object at trial to Kelly testifying as to his opinion of the manner and cause of Londono's death. Defense counsel raised a narrow objection to the admissibility of the listing of the manner and cause of death on the death certificate. While making that motion, defense counsel stated that defendant had no objection to Kelly's testimony because he was available for cross-examination with respect his opinion. The trial court noted the narrow basis of defendant's objection and defense counsel made no attempt to correct the court's understanding of the scope of the objection. In addition, defense counsel did not argue that Kelly's opinion was inadmissible because it lacked a

scientific foundation or was within the ken of the average juror. We therefore examine defendant's argument under the plain error standard.

According to N.J.R.E. 702,

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In order to be admissible, proffered expert testimony must "concern a subject matter that is beyond the ken over the average juror," and address a field at a "state of the art" such that the expert's testimony will be sufficiently reliable. State v. Kelly, 97 N.J. 178, 208 (1984). Moreover, the witness must have sufficient expertise to offer the intended testimony. Ibid. Generally, "expert testimony is not necessary when the subject can be understood by jurors utilizing common judgment and experience." Campbell v. Hastings, 348 N.J. Super. 264, 270 (App. Div. 2002); accord State v. Hackett, 166 N.J. 66, 83 (2001).

Pursuant to N.J.R.E. 703, an expert opinion must be grounded in facts or data derived from: "(1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." An expert is not permitted to express "speculative opinions" or

33

"personal views" that are either unfounded in the record or that contradict the record. Townsend v. Pierre, 221 N.J. 36, 55 (2015).

We see no error in the trial court's admission of Kelly's testimony. Kelly testified about several subjects beyond the ken of an average juror, including: (1) that drug intoxication could be ruled out as a cause of death; (2) that certain ante-mortem, fresh injuries to Londono were consistent with an altercation; and (3) that Londono had no natural diseases that would account for her death. These opinions, which are based on scientific evidence, underly Kelly's ultimate opinion that the manner and cause of Londono's death was a violent homicide.

We do not agree with defendant's argument that an average juror can evaluate evidence of the dismemberment and disposal of Londono's body and reach an opinion with respect to the cause and manner of her death. Kelly did not, as suggested by defendant, base his opinion on the cause and manner of Londono's death solely on the dismemberment and disposal of her body. To the contrary, he relied in part on his opinions, based on scientific evidence, ruling out other possible causes of her death. The average juror could not have ruled out alternate causes of death. In addition, Kelly offered testimony with respect to the impact of the dismemberment on the ability to determine a cause of death, a subject also not within the ken of an average juror.

In support of his argument, defendant relies on State v. Jamerson, 153 N.J. 318 (1998). However, in that matter, the primary issue was whether the defendant's conduct in a fatal car accident satisfied the recklessness standard for purposes of a second-degree reckless manslaughter charge. Id. at 324. Over a defense objection, the medical examiner, who was not an accident reconstructionist, opined that the death of the victim was a vehicular homicide rather than an accidental death based upon eyewitness statements describing the circumstances of the accident. Id. at 330-33. The Supreme Court reversed the defendant's conviction, holding that the medical examiner was not qualified as an expert or lay person to assess the way the defendant operated his vehicle or the cause of the accident. Id. at 324. The Court concluded the expert's testimony should have been limited to the physiological cause of the victim's death, including ruling out other possible causes of death. Id. at 324, 337-42.

In State v. Locascio, 425 N.J. Super. 474, 477 (App. Div. 2012), on which defendant also relies, the pivotal factual question was whether the defendant or her companion, both of whom were intoxicated, was driving at the time of a one-car accident which resulted in the companion's death. At trial, and over a defense objection, the medical examiner, designated as an expert only in forensic pathology, opined that the defendant was the driver and then, using

35

biomechanical principals, reconstructed how both parties were injured after the car struck a tree and they were each ejected from the vehicle. Id. at 477-78, 485-89. We reversed the defendant's conviction, concluding the medical examiner did not have sufficient expertise in accident reconstruction or biomechanics to offer the above opinions. Id. at 489-95.

Unlike the expert witnesses in Jamerson and Locascio, Kelly's testimony did not exceed the scope of his qualifications. His testimony was limited to an explanation of how he reached the opinion that the manner and cause of Londono's death was a violent homicide, matters within his field of expertise.

C.    Testimony on Cellphone Location Data.

Defendant argues the trial court erred when it admitted testimony regarding the "frequent location" GPS data extracted from his iPhone. He argues the court should have required the State to present expert testimony explaining how Apple compiled this data and establishing its reliability. We disagree.

Defense counsel objected to David testifying about the GPS coordinates stored in defendant's phone under "frequent locations" because David had no expertise as to how Apple compiled this data and could not demonstrate its reliability. During an N.J.R.E. 104 hearing, David testified that: (1) he, and the FBI in general, use GPS data stored on cell phones to track individuals; (2) he

was not familiar with Apple's proprietary method of storing the GPS data in their phones; (3) he was concerned only with the satellite-generated coordinates, not Apple's designation of the data as "frequent locations;" and (4) he used the GPS data only to confirm his historical cell site data analysis.[3]

The trial court allowed David's expert testimony in an oral decision:

> It is true that [David] . . . testified today that he doesn't know how Frequent Locations are stored and exactly what Frequent Locations are in an iPhone in particular. But what was important was . . . he didn't use the fact that something was a Frequent Location. What he used was the GPS coordinates that were recorded on the phone and were extracted from the phone for the . . . Cellebrite analysis.
>
> The GPS coordinates were -- it's true they were stored on the phone because the phone identified certain locations as Frequent Locations. But what was important was the GPS coordinates, the longitude/latitude, and also the precision data that's included . . . on the phone.
>
> All of that information was downloaded by Cellebrite. All that information was relied upon by . . . David. It's information that he regularly relies upon in connection with this kind of analysis.

---

[3] We note defendant does not contest the trial court's admission of David's testimony regarding historical cell site data evidence. In addition, to the extent defendant's brief suggests David testified with respect to frequent location data from Londono's phone, he is mistaken. Londono's phone was never recovered. It was, therefore, not possible for the State to obtain frequent location data from her phone. David testified about the approximate location of Londono's phone based on historical cell site data provided by Londono's service provider.

He testified that . . . when he's fortunate enough to actually . . . be able to download the GPS data on the device and use it in connection with his analysis, it is the most precise information he has and he uses it not as the be all and end all of his analysis, but . . . to confirm the [accuracy of] . . . the historical cell site analysis that he performs . . . .

That's what he did in this case and he is clearly in my opinion qualified based on his training, experience, and expertise to provide an expert opinion on this case including his use of GPS coordinates downloaded from the device . . . in order to . . . confirm the other conclusion that he reached in this case.

. . . .

I'm not finding that he's an expert in GPS. I'm finding that he relies upon GPS data downloaded from a device. When he actually has the device he in connection with rendering his expert opinions, that's something he normally does.

As noted above, "expert testimony is not necessary when the subject can be understood by jurors utilizing common judgment and experience." Campbell, 348 N.J. Super. at 270. Expert testimony is appropriate where the subject matter of the testimony is "so esoteric that jurors of common judgment and experience cannot form a valid judgment" as to the fact in issue. Butler v. Acme Markets, Inc., 89 N.J. 270, 283 (1982); State v. Doriguzzi, 334 N.J. Super. 530, 538 (App. Div. 2000). "Expert testimony is not necessary to explain to jurors the obvious." State v. Cain, 224 N.J. 410, 427 (2016).

"[T]he accuracy of GPS devices is accepted" by courts. State v. McDuffie, 450 N.J. Super. 554, 570 (App. Div. 2017); see also Commonwealth v. Thissell, 928 N.E.2d 932, 937 (Mass. 2010) ("GPS technology . . . is a widely used and acknowledged as a reliable relator of time and location data."). So too is the fact that the GPS tracking of cellphones is ubiquitous in modern society. See State v. Earls, 214 N.J. 564, 568 (2013) ("[T]he cell phones we carry can also serve as powerful tracking devices able to pinpoint our movements with remarkable precision and accuracy.").

The notion that an iPhone's user's movements can be tracked with precision by analyzing GPS data saved on their phone is not beyond the ken of the average juror. Thus, expert testimony was not necessary to explain that commonsense proposition to the jury. See Johnson v. State, 179 A.3d 984, 995 (Md. 2018) (holding expert testimony was not required to admit GPS location data); United States v. Brooks, 715 F.3d 1069, 1077 (8th Cir. 2013) (holding trial court did not abuse its discretion in taking judicial notice of "accuracy and reliability of GPS technology.").

It was not necessary for David to explain to the jury how Apple collects GPS data on a cellphone or why that data is considered accurate. We agree with the trial court's decision that the jury could, without expert testimony, assess

whether David's reliance on the GPS data from defendant's and Londono's cellphones affected the credibility of his expert opinion with respect to cell site history data.

### D.    Consciousness of Guilt Testimony.

At an N.J.R.E. 104 hearing, Cruz testified that on the day after Londono disappeared, defendant, who he had known for twenty years, came to the restaurant where Cruz worked.  According to Cruz, defendant appeared nervous and despondent and said that he had "big trouble," "a problem," and wanted to jump off the GWB.  Cruz said defendant's statements were out of character and Cruz did not take his suicide threat seriously.

Before the trial court, defendant argued his remarks were not a serious suicide threat and, pursuant to State v. Mann, 132 N.J. 410 (1993), only evidence of an actual suicide attempt is admissible for purposes of proving consciousness of guilt.  In addition, defendant argued the evidence should be excluded under N.J.R.E. 403 because it was of limited probative value and that limited probative value was outweighed by its prejudicial effect.  The State argued defendant's statements were admissible, even if Cruz did not believe them to be a credible suicide threat.

The trial court found defendant's remarks, which arguably showed suicidal ideation, were statements by a party opponent admissible under N.J.R.E. 803(b)(1). The court acknowledged the remarks did not fit perfectly under the analytical framework set forth in Mann, but found their timing, on a day when no one but Londono's killer knew she was dead, and unusual nature supported a reasonable inference they were evidence of defendant's consciousness of guilt.

The trial court relied on the same rationale to find the Google searches were admissible. The court also stated it would make clear in its instructions that it was the jury's obligation to determine the value of the suicide-related evidence, including whether the evidence constituted a serious suicide threat. The court ultimately did give the jury such an instruction.

As explained above, we defer to a trial court's evidentiary ruling absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). We will not substitute our judgment for the trial court's unless the evidentiary ruling is "so wide of the mark" that it constitutes "a clear error in judgment." Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)).

Our review of the record revealed no abuse of the trial court's discretion. "Like evidence of flight, evidence of a defendant's suicide attempt that follows

the alleged commission of an offense generally is admitted." Mann, 132 N.J. at

421. As our Supreme Court has held:

> It is well known that mental state is not conducive to demonstration through direct evidence. In criminal prosecutions, proof of a defendant's mental state often must be inferred from the circumstances and the jury must make its determination by both the act and by the surrounding circumstances. The key to circumstantial evidence generally, and as applied to state-of-mind questions specifically, is whether it bears a logical connection to the disputed fact . . . .
>
> When an individual's state of mind is at issue, a greater breadth of evidence is allowed. We admit circumstantial evidence that has a tendency to shed light on defendant's mental state or which tends fairly to explain a defendant's actions, notwithstanding that the evidence relates to conduct that occurred before the offense. Similarly, conduct that occurs after the charged offense circumstantially may support inferences about a defendant's state of mind.
>
> [Williams, 190 N.J. at 124-25 (citations, quotations, and alterations omitted).]

We agree with the State's argument that the two interrelated strands of evidence – the suicide-related remarks and the suicide-related Google searches – viewed in conjunction with other evidence admitted at trial tend to establish the two primary contested issues in this case, identity and intent. The temporal proximity of the suicide-related evidence to Londono's murder and the

dismemberment of her body strongly suggest defendant's regret for his involvement in those acts.

We are not persuaded by defendant's argument that the evidence was not admissible because he did not actually attempt to commit suicide. We find no error in the trial court's determination that defendant's verbal expression of his contemplation of suicide, along with his Google search for information on how to commit suicide, so close in time to Londono's death and dismemberment could be interpreted by the jury as evidence of his consciousness of guilt. The holding in Mann does not preclude admission of evidence other than an actual suicide attempt for those purposes. Moreover, the judge adequately instructed the jury that it was their obligation to decide whether the threat and Google searches proved defendant actually considered committing suicide to avoid an accusation or arrest for Londono's murder and whether that evidence constituted proof of his consciousness of guilt.

E.    Low-Copy Number DNA Testing.

In State v. Rochat, 470 N.J. Super. 392, 400 (App. Div. 2022), issued after entry of defendant's JOC, we held the trial court erred when, during a murder trial, it admitted expert testimony regarding LCN DNA typing on a both single source specimens and mixtures, and the use of forensic statistical tool, a

43

propriety probabilistic genotyping system for DNA mixtures to determine probability ratios, because such methods are not generally accepted in the scientific community.

Defendant argues that the holding in Rochat may apply here, but "it is hard to tell for sure whether" this trial "involved LCN DNA testing." Thus, defendant argues, if his murder conviction is not reversed on other grounds, we should remand this matter for a hearing to determine if the evidence admitted at trial was the result of LCN DNA testing.

The State counters that both Rochat and the expert testimony adduced at trial establish beyond a reasonable doubt that the LCN DNA technique was not used here. In Rochat, we exhaustively detailed OCME's development, use, and eventual abandonment of the LCN DNA technique in January 2017, six months before Londono's murder. Id. at 401-15. OCME is one of the laboratories that analyzed the DNA samples at issue here.

In addition, although a number of foreign labs used this methodology to analyze small amounts of DNA, no more than a handful did in the United States. In People v. Williams, 147 N.E.3d 1131, 1143, n.11 (N.Y. 2020), the New York Court of Appeals observed that only two laboratories in the United States used the LCN DNA technique and only OCME used it in criminal matters. In Rochat,

we stated that the Prince Georges County DNA laboratory also used the LCN DNA technique forensically in a criminal matter. 470 N.J. Super. at 445. The parties identified no opinion indicating Bode, the laboratory that analyzed the mixed DNA result on which defendant focuses, ever employed the LCN DNA technique.

Moreover, Nash, the DNA analysis from Bode, testified that YSTR DNA testing, the method used in this case, is the same as conventional STR DNA testing, except it focuses only on the Y chromosome. Rochat makes clear that LCN DNA testing differs from conventional STR DNA testing. 470 N.J. Super. at 410-11.

Defendant does not counter this evidence, arguing only that because small amounts of DNA were detected in some of the samples obtained from Londono's remains LCN DNA testing may have been used. The record here, however, contains no evidence that LCN DNA testing was used to create the evidence admitted at defendant's trial.

F.    Stalking Conviction.

A defendant commits the crime of fourth-degree stalking if he or she "purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety

of a third person or suffer other emotional distress." N.J.S.A. 2C:12-10(b). Stalking is elevated to a third-degree crime if the defendant is on parole for an indictable offense when he or she commits this offense. N.J.S.A. 2C:12-10(e).

At trial, the State presented evidence defendant installed a GPS tracking device on Londono's vehicle and monitored her movements in real time by using an application on his phone. During the bifurcated proceeding, the State established defendant was on probation for an indictable conviction in New York at the time he was tracking Londono's movements.

Defendant argues the conviction must be reversed because the State did prove Londono was aware of the tracker on her vehicle. In support of his argument, defendant relies on H.E.S. v. J.C.S., 349 N.J. Super. 332 (App. Div. 2002), aff'd in part and rev'd in part, 175 N.J. 309 (2003). In H.E.S., the defendant's estranged wife filed a domestic violence complaint alleging the predicate act of terroristic threats, N.J.S.A. 2C:12-3, based on an encounter at their home. Id. at 336. At the trial, the wife testified that a few days prior to the filing of her complaint, she discovered surveillance equipment in her bedroom, which was connected by wire to a VCR in the defendant's bedroom. Id. at 338. She testified that the equipment explained how the defendant had recently detailed information about her movements and communications. Ibid.

The court found that the wife had not proven terroristic threats, but had proven harassment and stalking based on the defendant's installation of surveillance equipment in her bedroom. Id. at 340-41. On that basis, the court entered a final restraining order against the defendant. Id. at 341.

Before this court, defendant argued that the evidence was insufficient to support a finding he engaged in harassment or stalking. Id. at 346. We agreed that the wife did not prove harassment because she did not establish the defendant installed the surveillance equipment with the purpose to harass, alarm, or seriously annoy her, given that he intended for her to be unaware of the presence of the equipment. Id. at 347-49. With respect to stalking, we noted that the "statute includes an objective and not a subjective test of the effect of a perpetrator's purposeful conduct: that a 'reasonable person' would 'fear bodily injury'" from the defendant's course of conduct.[4] Id. 350-51. We continued, "[w]e are also convinced that in order to determine that a defendant is guilty of stalking, it is irrelevant whether the target is aware of the conduct as it occurs or whether it is discovered after the fact." Id. at 351.

---

[4] As noted above, the current version of N.J.S.A. 2C:12-10(b) provides that a person is guilty of stalking if they "purposefully or knowingly engage[] in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress." See L. 2009, c. 28, § 1, eff. Mar. 21, 2009.

The Supreme Court reversed our conclusion that the wife had not proven the predicate act of harassment, H.E.S., 175 N.J. at 326-27, and affirmed our conclusion that the wife had established the predicate act of stalking, id. at 327-28. In reaching its decision on stalking, the Court considered not only the defendant's placement of the surveillance equipment in the wife's bedroom, but the manner in which he used the information he obtained from the surveillance to put the wife in fear for her bodily safety. Id. at 329-31. The Court did not mention the need for the victim to be aware of the surveillance equipment for a finding of the predicate act of stalking.

We do not agree that our holding in H.E.S., to the extent it remains precedential after the Supreme Court's decision in that case, precludes a defendant's stalking conviction. Under the objective standard set forth in N.J.S.A. 2C:12-10(b), the State need prove only that defendant's course of conduct directed at Londono "would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress." Londono's awareness of defendant's conduct is not an element of the crime. The absence of such an element makes sense here, where defendant's tracking of Londono's movements went unnoticed by her before she was murdered by him. We do not interpret N.J.S.A. 2C:12-10(b) to relieve defendant of criminal

liability for his stalking of Londono because he killed her before she became aware he had been tracking her movements.

We have considered defendant's remaining arguments, including those relating to the bifurcation of the trial of the stalking charge, and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division